**In re AIR CRASH NEAR CALI, COLOMBIA ON DECEMBER 20, 1995.**

**No. 96–MD–1125.**

United States District Court, S.D. Florida.

Oct. 10, 1997.

Aaron S. Podhurst, Michael S. Olin, Joel S. Perwin, Victor M. Diaz, Jr., Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, FL, Marc S. Moller, Kreindler & Kreindler, P.A., New York City, Kevin A. Malone, Krupnick, Campbell, Malone, Roselli, Guser, Slama & Hancock. P.A., Ft. Lauderdale, FL, for plaintiffs.

Howard Barwick, Lyndall M. Lambert, Mary R. Andrews, Thomas E. Ice, Barwick, Dillian, Lambert & Ice, P.A., George A. Manfredi, Carla M. Barrow, Sullivan, Johnson & Manfredi, Miami, FL, for defendants.

## AMENDED ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT ON LIABILITY

MARCUS, District Judge.

THIS CAUSE comes before the Court upon the PSC's motion for partial summary judgment as to the issue of liability in the passenger cases, filed July 14, 1997, and the cabin crew Plaintiffs' separate motion for summary judgment as to liability, filed July 14, 1997. With their motion, the passengers seek entry of an Order finding Defendant American Airlines, Inc. ("American" or the "Defendant") liable for compensatory damages flowing from the crash of American Airlines Flight 965 on December 20, 1995 in the mountains near Cali, Colombia. The passengers also ask the Court to find that their compensatory damages are not capped by certain provisions of the Warsaw Convention, which limit an air carrier's liability except in cases of "willful misconduct." The cabin crew members, whose lawsuits do not implicate the Convention, seek entry of an Order finding American liable for negligence under Florida law.

The Plaintiffs' motions are ripe for resolution, and this Court took extensive argument on them during pre-trial hearings on August 18, 19, 20 and 25, 1997. After an exhaustive review of the parties' submissions, which include lengthy memoranda and voluminous exhibits, the Court concludes that the Plaintiffs are entitled to the relief that they seek. Simply put, no reasonable jury could find that acts of the pilots of Flight 965—and in particular the pilots' decision to continue their descent at night from a grievously off course position in mountainous terrain—amounted to anything less than willful misconduct, whether that term is construed to require an objective or a subjective inquiry. Moreover, no reasonable juror could find that the pilots' conduct was not among the proximate causes of the crash. We reach this conclusion with considerable hesitance, mindful of the significance of the litigation and the heavy burden that must be met before summary judgment may be entered in a Warsaw Convention case. Nevertheless, even giving the Defendant every benefit of the doubt, and drawing every reasonable inference in its favor, the record cannot fairly be read to support any other result. Accordingly, for the reasons detailed at length below, the pending motions for summary judgment must be, and are, GRANTED in their entirety.

I.

As noted above, this litigation arises out of the tragic crash of American Airlines Flight 965 on the evening of December 20, 1995 as the plane attempted to navigate its arrival to the Alfonso Bonilla Aragon airport at Cali. One hundred fifty-one passengers and the six members of the cabin crew died as a result of the crash, with another four suffering non-fatal injuries. The two cockpit pilots, Captain Nicholas Tafuri and First Officer Donnie Ray Williams, also perished in the crash. The initial lawsuit was filed on December 29, 1995. Since then, almost 160 additional cases have been consolidated before this division of the Southern District of Florida, including a number of lawsuits that were filed in other

federal judicial districts, but subsequently transferred here by the Judicial Panel on Multidistrict Litigation. A nine-member steering committee (the "PSC") represents the Plaintiffs in these consolidated cases with respect to liability issues. The Defendants are American Airlines, Inc., the estates of the two pilots and, in the six cabin crew cases, American's parent corporation, AMR.[1] Honeywell, Inc., the manufacturer of the flight management computer ("FMC") used by the pilots of Flight 965, and Jeppesen–Sanderson, Inc. ("Jeppesen"), the manufacturer of certain materials used in conjunction with the FMC, have been impleaded by American in several recently-filed cases, although the Court has denied American's motion to join these third parties in the other consolidated lawsuits.

The parties agree that the claims of the passenger Plaintiffs arise under what is commonly labeled the Warsaw Convention, an international treaty binding on the United States that, by its terms, applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire." *See* 49 Stat. 3000, *reprinted at* 49 U.S.C. § 40105. Article 17 of the Convention, in the official English translation, states that "[t]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." At the time of this accident, Article 22, as modified, limited American Airlines' potential liability for compensatory damages flowing from the death or personal injury of the passengers on Flight 965 to $75,000 per victim. Article 25, however, created an important caveat to this language by explaining that "[t]he carrier shall not be entitled to avail [it]self of the provisions of this convention which exclude or limit [its] liability, if the damage is caused by [its] willful misconduct."

The PSC contends that many acts by the pilots of Flight 965 deviated so markedly from the standard of care, in the face of so plain and obvious a danger, that a finding of willful misconduct is inevitable. The Plaintiffs allege a large number of subsidiary errors by the pilots, including flying the plane at an excessive speed and leaving the speed brakes on while attempting an abrupt ascent shortly before colliding with the mountain, but focus primarily on four discrete acts. First, and principally, the Plaintiffs assert that the pilots violated American Airlines policy and Federal Aviation Regulations ("FAR's") by knowingly permitting Flight 965 to descend after the plane veered far off the prescribed approach path to the Cali airport. Second, the Plaintiffs contend that the pilots violated American Airlines policy by knowingly deviating from the flight plan and attempting a "short cut" into the airport. Third, the Plaintiffs allege that the pilots violated American Airlines policy by failing to verify that the identifier for a waypoint on the route they elected to fly was correct before entering it in the FMC. Finally, the Plaintiffs insist that the pilots, once off course, violated American Airlines policy by ignoring the instructions of the Colombian air traffic controller ("ATC") and attempting to bypass one of the required waypoints. The PSC suggests that these acts, standing alone or in the aggregate, demonstrate willful misconduct within the meaning of the Convention.

American does not deny that the pilots made what it calls "human mistakes." Def. Resp., at 3. Indeed, it squarely acknowledges at least two breaches of the applicable standard of care and concedes that the accident was "an avoidable controlled flight into terrain." Pre–Trial Stipulation, August 13, 1997 ("PTS"), at § V ¶ 20. The Defendant maintains, however, that a reasonable jury could find that the acts of the pilots did not, individually or in the aggregate, amount to willful misconduct. Moreover, according to American, even if the pilots did commit

---

**1.** On August 25, 1997, the Court granted AMR's motion for summary judgment in these cases. The reasons underlying this ruling are summarized in a separate Order. During the pre-trial conference, the PSC indicated that the pilots' estates eventually will be dismissed as Defendants in most, if not all, of the consolidated lawsuits. The summary judgment motions filed by the passengers and the crew do not seek this relief against the estates.

wrongful acts, a reasonable jury could find that these acts did not proximately cause the crash of Flight 965. Rather, the wrongful acts of Jeppesen, Honeywell and the Colombian ATC's superseded any misconduct by the pilots. On the strength of these arguments, American contends that it is not liable to the crew members on a theory of negligence, and the $75,000 limitation on damages in the passenger cases should remain in place.[2]

## II.

We begin by laying out the undisputed, material facts of this litigation, pausing occasionally to identify some of the parties' points of disagreement. Although many of these facts will be repeated and discussed in greater detail at subsequent points in this Order, it is helpful to provide an initial overview of the acts and omissions that both parties acknowledge took place on the night of the accident. Unless otherwise noted, the following facts have been proposed, stipulated to or left uncontested by American Airlines.

Flight 965 left Miami International Airport on the afternoon of December 20, 1995, bound for Cali, Colombia to the south. The aircraft pushed back from the departure gate 34 minutes late, and experienced an additional ground delay of one hour and 21 minutes before departing. PTS, at § V ¶ 4. The airplane used was a Boeing 757 which the parties acknowledge was airworthy and in good mechanical and structural condition when it left Miami. *Id.* at ¶ 30. In the cockpit were Captain Tafuri, the pilot, and First officer Williams, the co-pilot. *Id.* at ¶ 31. Both Tafuri and Williams were Federal Aviation Administration ("FAA") licensed pilots, each with over 2200 total flight hours in Boeing 757's or 767's and extensive experience with American Airlines. *Id.* ¶¶ 5–11, 15–16. Tafuri had flown 13 American Airlines flights as Captain to Cali prior to December 20, 1995, and indeed, an American supervisor carried out Tafuri's annual international line check on December 9, 1995— just eleven days before the accident—on a

flight from Miami to Cali. *Id.* ¶¶ 14, 42. Williams had, never flown an American Airlines aircraft into Cali prior to December 20th. *Id.* ¶ 41. At all material times during the flight, Williams was flying the aircraft and Tafuri was primarily handling radio communications. *Id.* ¶ 44.

Prior to their departure, Tafuri and Williams were given a "dispatch package" which included a printed, computer-generated flight plan. The flight plan, among other things, called for Flight 965 to follow a specified route during the arrival and approach to the airport at Cali. The arrival phase is typically conducted in accordance with a specified STAR (Standard Terminal Arrival Route), which consists of a series of waypoints or "fixes" in the terminal area defining the path along which the aircraft must descend toward the airport. These waypoints are often radio beacons of various types known as navigation aids or "navaids." Navaids may consist of VOR's ("VHF Omnidirectional Range" stations) or NDB's (nondirectional beacons), both of which emit radio waves that can be tuned in from the cockpit. By tuning radio receivers to the specified frequency for a VOR, for example, an aircraft's pilots can determine the compass direction to and in some instances the distance from the VOR in question. These navaids can help pilots establish their position in the sky as well as distances from point-to-point. Approaches, like arrivals, are typically defined in terms of a series of waypoints, and are intended to guide the aircraft from the arrival path onto the prescribed runway at the airport.

Flight 965 was equipped with a flight management computer. In an aircraft without an FMC, pilots fly by relying on "raw data"—specifically, the navigational information, such as magnetic compass heading, speed and altitude, that is displayed on dials and gauges on the instrument panel. The FMC, however, can be used to translate data received from navaids into a map-like pictorial view of the aircraft's position in the sky. This view appears on electronic horizontal

---

**2.** It is unclear whether American opposes the entry of summary judgment in the passenger cases on the narrow question of its liability for compensatory damages under Article 17 (as opposed to the question of whether those damages should be limited by Article 25).

situation indicator ("EHSI") screens that are located opposite each pilot on the cockpit's main instrument panel. FMC inputs are made on a device known as a CDU, which resembles a calculator with a keypad and a small digital screen. Some or all of a pre-programmed flight plan, or the approach and arrival paths for particular airports, may be called up by the pilots from the computer's database simply by making certain keystrokes on the CDU. In other words, if a pilot elects to follow a particular STAR for an arrival, he need not type separately all of the waypoints that make up that STAR; instead, he may simply call up the STAR by its identifier(s). Similarly, all of the waypoints along a desired approach path may be called up by typing the appropriate identifier. Once these steps are taken, the computer can be instructed to fly the aircraft automatically along the selected route (placing the plane in "L–Nav" mode). Alternatively, the pilots can simply use the EHSI screens for visual assistance while they manually fly the aircraft by relying on raw data.

In this case, we are concerned principally with four waypoints defining the arrival and approach to the Cali airport. These waypoints are, traveling north to south, the Tulua VOR (identified as "ULQ"), the fix known as "D21 CLO," the Rozo NDB and the Cali VOR (identified as "CLO"). The Cali VOR, located nine miles south of the airport, is the benchmark for the other waypoints. The Tulua VOR is located 43 miles to the north of the Cali VOR on a radial of 202°.[3] The D21 CLO waypoint is located 21 miles to the north of the Cali VOR on a radial of 193°. The Rozo NDB is located roughly 12 miles to the north of the Cali VOR, on or slightly offset from the same 193° radial. The strip of concrete on which Flight 965 was expected to land at the airport is known as Runway 1 when approached from the south and Runway 19 when approached from the north. The Cali airport is located in a valley approximately 43 miles long and 12 miles wide and surrounded by high terrain. The arrival and approach paths for aircraft landing at the airport are designed to keep planes in an "airway" in the center of the valley.

American Airlines pilots flying into Central and South America must receive special training intended to acquaint them with the unique features of these regions. Among other things, pilots are trained to keep in mind two critical precepts when attempting to land airplanes in Latin America. First, they are instructed, in no uncertain terms, not to rely on local ATC's for information about their location or position in the sky. For example, the July, 1995 Pilot Reference Guide for Latin America, in a section titled "Warning! Arrivals May be Hazardous," makes the following points, all of which have powerful significance in this litigation:

> Controllers will clear you to descend below minimum safe altitude in mountainous terrain.... The controller will make assumptions that you must understand before you learn it the hard way. The controller assumes that:
>
> - You are on course;
> - You are where you say you are;
> - You know where the high terrain is;
> - You will *not accept* a clearance that will take you into the terrain.
>
> If you do accept the clearance, the controller will conclude that all of the above are true.

PSC Mot., exh. 8, at 62–63 (emphasis in original). The Guide goes on to emphasize that:

> If the airport is in high terrain, you are best advised to assume the controller will become distracted and allow you to fly into a mountain. It has happened.
>
> *Never rely on terminal controllers to keep you from hitting mountains!*
>
> *Do not trust them....*
>
> Know exactly where you are and do not accept descent instructions unless you know it is safe to do so.

*Id.* at 63 (emphasis in original).

The second critical precept American Airlines pilots are trained to observe is a corollary of the first. Specifically, pilots are warned of the dangers associated with flying into Latin American airports, many of which, like that at Cali, are located at high altitudes

---

**3.** 180° represents due north from the Cali VOR.

amid rugged mountainous terrain. Consequently, it is literally, as the Guide makes clear in a section entitled "Staying Alive," a matter of life or death for pilots to ensure that they are absolutely certain where they are in the sky, and suspend any descent until they know where they are:

> There have been more major aircraft accidents in South America than anywhere else. There are good reasons for this. The most important factor, however, is you. You must know what is going on and where you are. . . .
>
> It seems obvious to say that you must know where you are at all times when operating in the southern divisions. The reason for saying this is to emphasize that you must be able to pinpoint your location on the enroute charts. If you are not used to flying with the charts out and open, then you must learn to do that down south because of the notes on the charts. These notes often define procedures you won't find anywhere else. . . .
>
> While knowing your enroute location can be critical, knowing where you are in the terminal area, around the dangerous high terrain airports of Central and South America, can be vital. Most of the aircraft that have hit the mountains did so because the crew apparently *did not* know where they were. The tolerances get finer and finer as you get into high mountains. For that reason, it is essential to monitor and rely upon raw data from ground-based Navaids, *whenever you descend from altitude.*

*Id.* at 63, 71–72 (emphasis in original). In a section titled "Terminal Procedures," the Guide continues, in a passage with significant implications here, that "[b]ecause of high terrain, it is imperative when operating in Central and South America that you *continually verify your exact location by every means available." Id.* (emphasis added). In a section titled "Hazards," the Guide offers the following advice:

> There are few areas of the world that are as potentially dangerous to flight operations as Central and South America. The reasons include terrain, weather, ATC, runways, and communications, but by far the most dangerous element in this environment is a flight crew that lacks *situational awareness.* High mountains, bad weather, and possibly poor or missed communication, coupled with lack of planning, ignorance of the environment and procedures, or inattention, are the ingredients for disaster.
>
> It is not possible to over-emphasize, nor to repeat too often, the warnings and rules you will find in this chapter. If you fail to heed them, if you arrive in the terminal area listless after a long night of quiet tedium and fail to prepare for the approach, fail to rouse your energy and concentration, you and all the people in your charge may join the long list of wasted lives and wreckage that have littered the high slopes of the Andes.

*Id.* at 77 (emphasis in original). A section entitled "Knowing the Altitude of the Terrain Below" emphasizes that pilots, in order to be sure where they are, must rely on more than the EHSI map, and therefore must "[t]ake the time to study the several ways in which terrain elevation is depicted on the enroute charts and arrival/departure plates." *Id.* short, pilots are required to *"[e]xamine the charts and plates to locate your position, cross-check every available indication and know where you are before you accept a descent." Id.* 79–80 (emphasis added).

These precepts are summarized in a series of rules for pilots flying into Latin America. The rules appear under the heading "Situational Awareness: A Working Definition."

> Situational awareness implies an alert active assessment of the aircraft's position relative to terrain, other aircraft, and the airport. . . . [N]owhere is it more of a requirement than in the vicinity of the high terrain airports of Central and South America.
>
> The natural instinct to employ the rules that follow is the mark of a pilot who has situational awareness. Situational awareness may become second nature after years of experience and training, but it can also be acquired through personal discipline, motivation, and a willingness to learn from the mistakes of others. . . .
>
> The challenge to those who devise and present training to the American Airlines

crews who will fly into Latin America has been to shatter the complacency that comes with years of experience flying in a predictable environment. With that in view we offer this warning in the form of a rule, when flying into Central and South America:

*Rule 1: You must take responsibility for your own survival!*

In Latin America, the relationship between the ATC controller and the flight crew is different from that in the US. It is different in this way: US controllers have rigid guidelines for descent and vectoring clearance, separation standards, communications protocols, complete coordination between adjacent control functions, and superb equipment. They have a directive role which we have come to accept without question.

In contrast, the attitude of the Central and South American controller is much less directive. This is a subtle but vital philosophical difference you must grasp, because it can save your life. Controllers in Latin countries have a role that is more in the nature of a coordinator, negotiator, or facilitator than U.S. controllers. In the US, we respond to the instructions of the controller with confidence that we will have terrain and traffic separation, that there is a clear plan for our sequence to the final approach. We request deviations as we think necessary, but normally not. We entrust ourselves to the person in front of the scope.

But the Latin American terminal controller may not even see you on a scope. If radar is available, high mountains between you and the destination airport may prevent contact. So when the controller issues a clearance for descent, it will normally be based upon the controller's *assumption* that you are taking charge of your own terrain separation. *The burden rests squarely upon you.*

Even the routing is really in your own hands. The controller is used to dealing with crews who have made hundreds of approaches into the area and know where every high point is. The controller, in an effort to expedite your approach (as a courtesy or sometimes to optimize sequencing), may clear you direct to a fix over high intervening terrain. A red flag should go up if you are given a clearance direct in terminal areas with high terrain. You should accept an abbreviated procedure *only* if you really know where you are, and what's below you, it's VFR [visual flight rules, as opposed to instrument flight rules ("IFR"), which Flight 965 was following], and the sun is shining. Whenever this is not the case, follow this next rule:

*Rule 2: Insist on the complete published approach/departure, unless you know exactly where you are and what's below you!*

Is it really possible that a controller will issue a descent to an altitude below the MEA [minimum enroute altitude], AMA [area minimum altitude], MORA [minimum off-route altitude], or M.S.A. § [minimum safe altitude]? Yes, it is done routinely. If you'll examine some of the approaches into airports surrounded by high terrain, you will see that if you *don't* descend below these guideline altitudes, in some cases, you won't be able to make the approach. The trick is to remember the first rule: *You must take responsibility for your own survival!* That brings us to the next rule:

**Rule 3: Do not descend unless you know exactly where you are and the safe minimum altitude,**

There are two parts to this rule: knowing where you are and knowing the safe minimum altitude. The two issues are entwined. You can determine terrain elevation below you only if you know where you are.

*Id.* at 77–79 (emphasis in original) (boldface added).

In a post-accident document that succinctly reiterates pre-accident training, the Defendant reminded its pilots of the following points:

- "[C]ontinually verify [your] exact position by every means available [when flying in Latin America]"

- "Assume nothing. When clearances are received, check the MEA prior to de-

scending. Always have an enroute chart open to the correct area being flown."

- *"Know where you are; know where you are going; and know how to get there."*

- "You will be operating in an antiquated ATC environment, with usually little or no radar contact (Circa 1940's). You are the Captain, with much more responsibility than at any time in your career. Remember, it's your license and your life. Guard both!"

- "Constant Awareness of Position. The only safe place to descend below the MEA, MOCA [minimum obstruction clearance altitude], etc. is in a published holding pattern. You must use it to assure adequate terrain clearance at or above the MEA."

- "Do not request or accept direct clearances which result in off-airway flying."

- "You must know the MEA versus your present position."

- "Terminal Area Charts [ ] depict holding patterns along published routes that must be used for any unplanned maneuvering in the terminal area. They must be flown exactly as depicted."

- "Prior study [of arrivals and approach charts] is essential. You cannot wait until you get there."

- "Be aware of the MEA at all points on the approach and missed approach."

- "The Captain [must] thoroughly brief each departure, arrival and landing, regardless of weather, with particular attention to obstacle clearance and terrain. Appropriate area charts depicting terrain

and approach charts will be used in this briefing during the approach."

- "It is totally the pilot's responsibility to avoid terrain."

- *"If there is any question as to position, do not descend."*

*Id.*, exh. 17 (emphasis added).[4] There is no dispute that Tafuri and Williams knew about, and had been trained to observe in most if not all situations, these principles, which undoubtedly make the mistakes that occurred during the final minutes of Flight 965 more patent, and far more egregious, than they might otherwise be.

A great deal of our understanding of what unfolded during the final minutes of Flight 965 is based on the cockpit voice recorder ("CVR"), which recorded the interchange of remarks among Tafuri, Williams and the Colombian ATC's. The summary judgment record contains two transcriptions of the CVR. One version, quoted by the PSC in its motion, apparently is based on the work of an investigatory group of the National Transportation Safety Board ("NTSB") and was adopted by American in its May 31, 1996 NTSB submission. Recently, American Airlines retained an expert, Michael McDermott, to prepare a second transcript which reflects, at some critical points, a different interpretation of what was said. For purposes of this Order, we will, unless otherwise noted, use the "second" American Airlines transcript, although the differences between the first and second transcripts are generally of little moment and, where differences exist, they are not easy to square with words actually recorded on the tape played before and submitted to this Court.[5] The other principal

---

**4.** This document was prepared two months after the accident. American does not dispute that most of the provisos contained in it were taught to pilots prior to December, 1995. *See* PSC Mot., exh. 18, Rauhofer dep., at 74–82. The Defendant contends, however, that it is unclear whether, prior to the accident, pilots were instructed to "continually verify their exact position by every means available" and never descend "[i]f there is any question as to position," since there is no deposition testimony precisely conceding these points. But whether or not American Airlines pilots were instructed to verify their position "by every means available" (and according to the July, 1995 Latin American Pilot Reference Guide quoted above, they were), it cannot be disputed that pilots were trained to

take whatever steps are necessary to know precisely where they are as they descend. Moreover, even assuming that American pilots were trained prior to December, 1995 that they could descend in certain situations even if there was a "question" about position (an assumption largely unsubstantiated by the record, and contrary to one of the "Rules to Live By" in the Pilot Reference Guide—"Do not descend unless you know exactly where you are ..."), plainly no one disputes that the training received by Tafuri and Williams forbade descending an aircraft from a position as far off-course as that of Flight 965.

**5.** The transcript appears as exhibit one to the Defendant's Response. In the transcript, all of

source of information about Flight 965 is the digital flight data recorder ("DFDR"), from which we can discern, among other things, the heading and altitude of the aircraft during the descent. *See id.,* exh. 2.

What follows is an initial survey of the CVR transcript, which we present largely to provide some of the background for our analysis of what the Court sees as the critical issue in the lawsuit: did the pilots know, or was it so plain they must have known, that Flight 965 was out of the valley and off the published route while the aircraft was descending toward the dangerous terrain below? Originally, Flight 965 was expected to follow an arrival path that called for it pass over the Tulua VOR and continue south to the Cali VOR, and at that point turn completely around for the approach to Runway 1. The applicable charts generally provide that an incoming aircraft should be no lower than 15,000 feet above mean sea level ("MSL") at Tulua, 5000 feet at the D21 waypoint and 3900 feet at Rozo.[6] The airport itself is located approximately 3100 feet above MSL. The initial conversation excerpted here records the final communication between the pilots and the Colombian ATC stationed in Bogota. This communication took place with the aircraft about to commence the crucial stages of its arrival to the Cali airport. Over the prior seven minutes, the aircraft had descended from its cruising altitude of 37,000 feet to approximately 25,000 feet above MSL.

21:33:50

Tafuri [A]merican Nine Six Five, request lower [altitude clearance]

21:33:53

ATC

(Bogota) American Nine Six Five, can do[,] now descend to flight level two zero zero, report leaving two four zero

21:33:59

Tafuri We're leaving two four zero now and descending to two zero zero [(3)27]

21:34:04

ATC And then call Cali [ATC, on] frequency one one niner decimal one, buenos noches

21:34:07

Tafuri Please say the frequency again

21:34:09

ATC One one niner decimal one

21:34:13

Tafuri One one niner decimal one uh, feliz navidad senorita

21:34:16

ATC Muchas gracia, la mismo

21:34:19

Tafuri Gracias

21:34:22

Tafuri Center, American Nine Six Five leaving flight level two four zero, descending to two zero zero, buenos tardes

From this point forward, the pilots communicated with the ATC in Cali. The aircraft was, at this time, just over 63 miles from the Cali VOR, flying at roughly 320 knots on a heading of approximately 190°. In the course of the conversation excerpted below, the ATC cleared Flight 965 to the Cali VOR, instructed the pilots to "descend and maintain [15,000] feet" and told them to "report uh, Tulua VOR." Tafuri acknowledged these directions, including the duty to "report Tulua," but remarked that he understood the flight to be "cleared *direct* to Cali VOR" (emphasis added). After the ATC responded by saying "Affirmative," Tafuri programmed the FMC to fly the aircraft directly to Cali:

21:34:37

Williams Nineteen one or

21:34:39

Tafuri That's Cali

21:34:40

Tafuri Cali approach, American Nine Six Five

---

the comments of the pilots and the ATC's appear in capital letters. In those instances where we have quoted the transcript, we have attempted to employ standard rules of capitalization, but have retained the punctuation (or lack thereof) indicated in the exhibit.

6. Most American Airlines witnesses have acknowledged that the MEA for Tulua is 15,000 feet, *see, e.g., id.,* exh. 34, Daigle dep., at 214, 227–28, although Jeff Noe testified that the "minimum altitude" is 10,000 feet. *Id.,* exh. 21, at 142.

21:34:41

Williams Yeah

21:34:44

ATC

(Cali) American Niner Six Five, good evening, go ahead

21:34:47

Tafuri Uh, buenos nochas senor, American Nine Six Five leaving two three zero, descending to two zero zero, go ahead sir

21:34:55

ATC What your distance DME from Cali? [7]

21:34:57

Tafuri The DME is six three

21:34:57

ATC Roger, is cleared to Cali VOR uh, descend and maintain one five thousand feet, altimeter three zero zero two

21:35:09

Tafuri one five

21:35:09

ATC No delay expect for approach, report uh, Tulua VOR

21:35:14

Tafuri Okay, understood cleared direct to Cali VOR uh, report Tulua and uh, that altitude one five, that's fifteen thousand, three zero zero two, is that all correct sir?

21:35:25

ATC Affirmative

21:35:27

Tafuri Thank you

21:35:28

Tafuri I put direct Cali for ya in there

21:35:29

Williams Okay, thank you

21:35:44

Williams Two fifty below ten here?

21:35:47

Tafuri Yeah

It is American's view that the ATC, by answering "Affirmative" after Captain Tafuri remarked "cleared direct to Cali VOR," authorized Flight 965 to fly to the Cali VOR without having to follow the published route (which included, among other things, passing over Tulua). The PSC makes two points in response. It contends that ATC's in Latin America used the word "direct" to mean direct along the published route, and that Tafuri and Williams were trained to know this fact. The Plaintiffs also observe that the pilots' apparent belief that the aircraft was allowed to ignore the published route was wholly at odds with the instruction (acknowledged by Tafuri) to report at Tulua. These arguments may have merit.[8]

For our purposes, though, it is enough simply to acknowledge this dispute, since the pilots' route was clarified moments later after an additional exchange with the ATC:

21:36:20

Tafuri And flight attendants please prepare for landing, thank you [on public address channel]

21:36:24

Tafuri I sat 'em down and

---

**7.** DME, in this context, refers to the distance from the aircraft to the Cali VOR.

**8.** The PSC identifies the decision to program the FMC to fly directly to Cali as one of the acts supporting a finding of willful misconduct. Drawing every inference in favor of American, however, there may remain a jury triable issue on this point. There may, for example, be some dispute about whether American Airlines pilots were trained about this disparity in the use of the term "direct" prior to December, 1995. The PSC relies principally on a post-accident bulletin squarely highlighting the issue. PSC Mot., exh. 19, at 1 ("Controllers frequently use the term 'cleared direct' when they mean 'cleared via flight plan route.' Likewise when a flight is cleared 'TO' a VOR or fix as a clearance limit, it does not mean that a flight is cleared direct to

that fix."). The Defendant counters by pinpointing deposition testimony to the effect that American was unaware of the disparity until the accident at issue in this case. Jeff Noe, however, testified that he would have expected Tafuri and Williams to be aware of the problem "based on the training they would have received." *Id.*, exh. 21, at 153–54. Noe also conceded that he was aware of the issue prior to December 20, 1995, and described the language in the post-accident bulletin as basically placing a "higher emphasis" on the matter. *Id.* 153–55. Rauhofer likewise acknowledged that he was aware of the problem prior to December, 1995, and that he believed the bulletin was basically a "reiteration of information" he had learned throughout this piloting career at American. *Id.*, exh. 18, at 84–85.

21:36:27

ATC Niner Six Five, Cali

21:36:28

Tafuri Nine [on public address channel]

21:36:29

Tafuri Niner Six Five, go ahead please

21:36:31

ATC Kay sir, the wind is calm, are you able to approach Runway One Niner?

21:36:36

Tafuri Would you like to shoot the One Nine straight in?

21:36:38

Williams Uh, yeah, we'll have to scramble to get down, we can do it

21:36:40

Tafuri Uh, yes sir, we need lower altitude right away though

21:36:43

ATC Roger, Nine Six Five is cleared to VOR DME approach to Runway One Niner, Rozo Number One arrival, report Tulua VOR

21:36:52

Tafuri Cleared the VOR DME to One Nine, Rozo One uh, arrival, we'll report the VOR, thank you sir

21:36:58

ATC Report uh, Tulua VOR

21:37:01

Tafuri Report Tulua

There is no dispute that the ATC offered, and the pilots accepted, an arrival and approach path that called for Flight 965 to follow the Rozo 1 STAR and the VOR DME Rny 19 approach.[9] The Rozo 1 STAR begins at the Tulua VOR and ends at the Rozo NDB; the VOR DME Rny 19 approach route largely, if not entirely, complements and extends the Rozo 1 STAR. What ensued,

however, was at least initial confusion in the cockpit concerning just where the pilots were supposed to be flying. First Officer Williams seems to have been under the misconception that the Rozo 1 STAR began at the Rozo NDB instead of Tulua; Captain Tafuri, however, indicated to him (presumably by referring to the published charts) that the Rozo NDB could be reached only after the aircraft touched Tulua. It is at this point that Tafuri asked the ATC for permission to go "direct to Rozo," a remark that set in motion a chain of events that culminated in the crash:

21:37:03

Tafuri I'm gonna give you to Tulua first of all, you, you wanna go right to Ca, uh, to Tulua?

21:37:08

Williams Uh, I thought he said the Rozo One arrival though

21:37:10

Tafuri Yeah, he did, we have time to pull it out

21:37:12

Tafuri And

21:37:17

Tafuri Rozo

21:37:20

Tafuri There it is

21:37:25

Tafuri Yeah, see that comes off Tulua

21:37:27

Williams Okay

21:37:29

Tafuri Uh, can, American Airlines uh, Nine Six Five go direct to Rozo and then do the Rozo arrival sir?

---

9. The Plaintiffs cite the pilots' "hasty" acceptance of the runway change as another example of willful misconduct. They contend that the pilots accepted the change in approximately six seconds without making any effort to examine the charts to determine if the aircraft could safely make the landing, a particularly egregious mistake since neither of the pilots had ever landed on runway 19 and Williams admitted that they would have to "scramble to get down." American acknowledges that the flight crew was "obligated to reject the change ... if they determined

that they did not have the information available or necessary to properly execute the runway 19 approach." PTS, at § V ¶ 59. Moreover, American policy requires pilots to conduct a full briefing of certain navigational aids before initiating an approach. *See* PSC Mot., exh 22. According to the Defendant, however, there is no requirement that this briefing take place before a new approach path is accepted, as opposed to initiated. Once again, for present purposes, we will construe the record in the light most favorable to American.

21:37:36

ATC Affirmative, take the Rozo One and Runway One Niner, the wind is calm

21:37:42

Tafuri Alright, Rozo, the Rozo One to One Nine, thank you, American Nine Six Five

21:37:46

ATC Affirmative, report Tulua on uh, twenty-one uh, miles uh, five thousand feet

21:37:53

Tafuri Okay, report Tulua at twenty-one miles and five thousand feet, American Nine uh, Six Five

21:37:59

Williams Okay, so we're cleared down to five now?

21:38:01

Tafuri That's right

21:38:02

Tafuri And

21:38:08

Tafuri Off Rozo, which I'll tune here

As noted below, there is a substantial dispute about whether Tafuri meant what he plainly said: "can [Flight 965] go direct to Rozo ... ?" The PSC asserts that Tafuri, having observed on the charts that flying directly to Rozo would allow the aircraft to follow a straighter path to the runway than would be the case if the aircraft had to make the slight "detour" required to pass over Tulua, knowingly sought permission to follow a "short cut" to the airport. Moreover, says the PSC, the ATC did not authorize this maneuver; rather, the ATC construed Tafuri's reference to "direct" to mean direct along the applicable published route, and for this reason reminded the crew to "take the Rozo One and Runway [19]" path, and specifically instructed them again to "report Tulua." *See supra*

**10.** The PSC suggests, although does not emphasize, that the pilots should have known that the identifier for the Rozo NDB was "R-o-z-o" not "R," since American Airlines pilots were taught that non-directional beacons associated with approaches are known by their published name, and Rozo was listed as "R-o-z-o" in the written flight plan. PSC Mot., exh. 9, at 28; exh. 10, at 3. The Defendant counters that three critical Jeppesen charts—the Runway 1 approach plate, the Runway 19 approach plate and the Rozo 1

note 8. American takes the position that Tafuri *meant* to ask "can [Flight 965] go direct to [Tulua] ... ?" as prescribed by the published route. In any event, it was during this exchange that one of the pilots sought to program the FMC to fly automatically to the Rozo NDB by typing the letter "R," which he apparently thought was the identifier for Rozo, into the CPU keypad.[10] A total of twelve waypoints appeared on the screen of the CPU; the first of these was a beacon known as Romeo, located approximately 132 miles to the northeast of the aircraft's position. It was the identifier for this waypoint that the pilot executed, sending the aircraft on a prolonged, and pronounced, turn to the left, towards the east and the mountains. There is no dispute that the pilots were required to, but did not, verify that the chosen waypoint was actually Rozo.

Within seconds, instruments in the cockpit reflected a substantial turn to the left, since the FMC, unbeknownst to the pilots, had begun to fly the aircraft automatically the direction of Romeo. Notably, when "R" was entered, the aircraft was *already* adjacent to or slightly to the southwest of Tulua.

21:38:26

Tafuri See where you get

21:38:27

Williams Yeah, we're gettin'

21:38:28

Tafuri At twenty-one miles and five thousand is part of the approach

21:38:30

Tafuri Okay?

21:38:31

Williams Okay

Arrival plate—showed the identifier for Rozo as "R." The Defendant also denies the PSC's suggestion that its pilots were taught to call up Rozo by reference to its full name. As discussed below, it is American's position that, if anyone is at fault for the pilots' use of "R" for Rozo, it was Jeppesen and Honeywell, although American does concede that the pilots breached the standard of care by failing to verify whether "R" was in fact the identifier for Rozo before executing this command.

21:38:33

Tafuri Uh off ULQ, so let me put ULQ in here, seventeen seven, cause I wanna be on raw data with ya

21:38:39

ATC Niner Six Five, distance now

21:38:42

Tafuri Uh, what did you want sir?

21:38:45

ATC Distance DME

21:38:46

Tafuri Okay, the DME is uh from Cali is uh, thirty,-eight

The initial exchange in this excerpt is transcribed quite differently, and far more plausibly, in the original CVR transcript as "See what I get?" ... "Yeah"—presumably in reference to Tafuri's attempt to tune the Rozo NDB on another navigational radio some 23 seconds earlier. The PSC suggests that, once Rozo was tuned, the radio's navigation needle would have been pointing toward the right rather than basically straight ahead, which is perfectly consistent with the aircraft's ongoing turn to the left and wholly inconsistent with the published route. In any event, it is undisputed that, by this point, Tafuri wished the aircraft to fly to Tulua:

21:38:49

Williams Uh, were we

21:38:49

ATC Roger

21:38:52

Williams We're going out to

21:38:54

Tafuri Let's go right O uh, Tulua first of all, okay?

21:38:58

Williams Yeah, where are we headed now?

21:38:58

Tafuri Seventeen seven, ULQ uh, I don't know, what's this ULQ, what hap, what happened here?

21:39:04

Williams Manual heat

21:39:05

Tafuri Let's come to the right a little bit

21:39:06

Williams Yeah, he's wanting to know where we're headed

21:39:07

Tafuri ULQ, I'm gonna give you direct Tulua

21:39:10

Williams Okay

21:39:10

Tafuri Right now

21:39:11

Tafuri Okay you got it?

21:39:13

Williams Okay

21:39:14

Tafuri And

21:39:18

Tafuri It's on your map, should be

21:39:19

Williams Yeah that's a left uh, left turn to ULQ

21:39:22

Tafuri Yeah, I gotta identify that fucker though, I

21:39:25

Tafuri Okay I'm getting it, seventeen seven, it just doesn't look right on mine, I don't know why

21:39:30

Williams Left turn, so you wanna left turn back around to ULQ?

21:39:32

Tafuri No

21:39:33

Tafuri Hell no, let's press on to

21:39:35

Williams Well we're

21:39:36

Williams Press on to where though

21:39:37

Tafuri Tulua

21:39:39

Williams That's a right, no that

As discussed in more detail below, it was during this period that the pilots discontinued the left turn and initiated a turn back toward the right and the valley. By 21:39:39, the aircraft was south of Tulua, and well to

the east of the valley and the 2029 and 1939 degree radials that define the Rozo 1 STAR. Of greater significance, the aircraft had continued its descent, and had dropped over 5000 feet since the "R" was entered into the FMC.

21:39:40

Tafuri Where're we going, one (twe) [partial word], come to the right, let's go to Cali first of all, let's, we got fucked up here didn't we?

21:39:45

Williams Yeah

21:39:46

Tafuri Go direct CLO

21:39:47

Williams Okay, oh

21:39:51

Tafuri How did we get fucked up here?

21:39:54

Tafuri Come to the right, right now, come to the right right now

21:39:55

Williams Yeah, we're, we're in a heading select to the right

21:39:58

Tafuri And

21:40:01

Tafuri And American uh, we're thirty-eight miles north of Cali and you want us to go to Tulua and then do the Rozo uh, to the uh Runway right, One One, One Nine?

21:40:11

ATC Kay the RO, you, you can land it, Runway One Niner, you can use Runway One Niner, what is your altitude and the DME from Cali?

21:40:21

Tafuri Okay, we're thirty-seven DME at ten thousand feet

The aircraft, during this period, is continuing to fly back toward the west, although it remains far from the valley and the published arrival and approach path. Although the PSC contends that Tafuri acted unconscionably by instructing Williams to "go direct [to Cali VOR]" without having first obtained permission from the ATC, the record suggests

that the command was never actually executed in the FMC.

21:40:24

Tafuri You're okay, you're in good shape now

21:40:25

ATC Roger

21:40:26

Tafuri We're headin', headin' the right direction, you wanna

21:40:27

ATC Report at five thousand on a final to one one, Runway One Niner

21:40:29

Tafuri Oh shit, you wanna take the One Nine yet?

21:40:34

Tafuri Come to the right, come, come right to Ca, Cali for now, kay?

21:40:34

Williams Uh, yeah

21:40:37

Williams Okay

21:40:40

Tafuri It's that fuckin' Tulua I'm not getting for some reason

21:40:44

Tafuri See I can't get, okay now, no, Tulua is fucked up

21:40:48

Williams Okay, yeah

21:40:49

Tafuri But I can put it in the box if you want it

21:40:52

Williams No, I, I don't want Tulua, let's just go to the extended centerline of uh

21:40:55

Tafuri Which is Rozo

21:40:56

Williams Rozo

21:40:56

Tafuri Why don't you just go direct to Rozo then, alright, I'm gonna put that over ya

By this point, it seems clear that the pilots are uncertain about where to fly or at least in which direction the plane is headed. The PSC asserts that the decision to abandon Tulua and fly directly to the Cali VOR or Rozo, while perhaps an attractive shortcut at that point, was both legally impermissible and in violation of American Airlines' policy. American, for its part, suggests that the ATC's comments at 21:40:11 gave the crew permission to bypass Tulua and simply proceed to maneuver for a landing on Runway 19. Consequently, says American, the pilots justifiably continued to fly to the west in order to intercept the 1939 radial.

21:40:58

Williams Okay, let's get some altimeters, we're out of uh, ten now

21:41:01

Tafuri Alright, sa

21:41:02

ATC And Nine Six Five, altitude?

21:41:05

Tafuri Nine Six Five, nine thousand feet

21:41:10

ATC Roger, distance now?

21:41:15 Terrain, terrain, whoop, whoop [sounds on cockpit microphone from aircraft's ground proximity warning system]

21:41:17

Tafuri Oh shit. Pull up baby

21:41:18 Whoop, whoop pull up, whoop, whoop, pull up

21:41:20

Williams It's okay

21:41:20

Tafuri Okay, easy does it, easy does it

21:41:23

Williams Help

21:41:23

Tafuri Up baby more, more

21:41:23 Whoop whoop

21:41:26 Pull up

21:41:26 Okay.

Williams

21:41:46

Tafuri Up up up.

21:41:26 Whoop whoop pull up.

21:41:28 [Collision; end of recording]

When the crash occurred, the aircraft had dropped to approximately 8900 feet above mean sea level, and was still some 33 miles northeast of the Cali VOR and ten miles east of the airway. The aircraft hit close to the summit of El Deluvio, one of the peaks lining the east side of the valley. It was not until the initial terrain warning, though, that the pilots halted their descent and attempted to climb. There is conflicting evidence about the speed of the aircraft when the collision occurred. The Defendants assert that the plane never violated the FAR prohibiting air speeds in excess of 250 knots below 10,000 feet; the Plaintiffs disagree, but apparently base their position on the ground speed of the aircraft. The ability of the plane to ascend rapidly was hampered by the fact that the speed brakes, deployed several minutes earlier, had not been pulled back.

### III.

■ The standard to be applied when reviewing summary judgment motions appears in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

As the Eleventh Circuit has explained:

> In assessing whether the movant has met [its] burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from

undisputed facts, then the court should deny summary judgment.

*Clemons v. Dougherty County,* 684 F.2d 1365, 1368–69 (11th Cir.1982) (citations omitted). In addition, the district court must view the record through the prism of the substantive evidentiary burden applicable to the particular cause of action before it. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Nevertheless, to withstand a summary judgment motion, the non-moving party must establish that, based on the evidence in the record, there can be more than one reasonable conclusion as to the proper verdict. *Id.* at 250, 106 S.Ct. at 2511. Consequently, "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* 252, 106 S.Ct. at 2512; *see also Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990) (noting that "once the moving party has met [its] burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial, [Rule] 56(e) shifts to the non-moving party the burden of presenting specific facts showing that such contradiction is possible"). Moreover, a response that consists of conclusory allegations and unreasonable inferences is insufficient to withstand the motion. *See Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir.1989). In short, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511; *see also Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d 1525, 1527 (11th Cir.1985) (noting that a motion for judgment as a matter of law should be granted unless there is " 'substantial evidence opposed to the motion[ ], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions' ") (quoting *Boeing v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (*en banc* )). We measure the pending motions for summary judgment against these familiar standards.

■ Before proceeding further, we pause to address American's observation that the PSC has not identified any case where a court entered summary judgment in favor of the plaintiffs on a claim of willful misconduct under the Warsaw Convention. Our own research confirms the absence of any published ruling to this effect. However, contrary to American's sweeping suggestion that "the concept of willful misconduct defies determination as a matter of law," Def. Resp., at 2, there are instances where courts have granted judgment as a matter of law in favor of defendants in Warsaw Convention lawsuits where the evidence could not support a finding of willful misconduct. *See, e.g., Saba v. Compagnie Nationale Air France,* 78 F.3d 664 (D.C.Cir.1996) (reversing district court's conclusion that air carrier acted with willful misconduct, and remanding with instructions that judgment be entered for the plaintiff subject to the liability limitations of the Convention). More to the point, the principles of Rule 56 apply to all lawsuits encompassed by the Federal Rules of Civil Procedure. There is *no* exception for Warsaw Convention proceedings, and nothing in the case law of this Circuit sustains the proposition that even if no reasonable juror could disagree that a defendant's employees engaged in willful misconduct, a plaintiff nevertheless must be compelled to take his claims to trial.

Undeniably, there are broad pronouncements in some cases that, at first blush, can be read to support the Defendant's belief. *See, e.g., In re Hijacking of Pan Am World Airways, Inc. Aircraft at Karachi, etc.,* 713 F.Supp. 1483, 1483 (S.D.N.Y.1989) (suggesting that, under the applicable Second Circuit law, "since an allegation of willful misconduct involves the state of mind of the defendant, that issue should normally be resolved by the trier of fact"). The most that can be said for these opinions, though, is that they turn on the assumption that willful misconduct may involve an inquiry into the state of mind of the defendant's employees, and that state of mind issues are especially difficult to resolve on summary judgment. But this is nothing more than a "general rule," *Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d

1472, 1476 (11th Cir.1991), and in this Circuit, as noted below, the willful misconduct inquiry is not entirely subjective. Moreover, even assuming that the term willful misconduct requires a subjective inquiry under all circumstances, there are many instances in the law where the evidence of state of mind is so unequivocal that summary judgment is proper and, indeed, expressly mandated by Rule 56. In employment discrimination litigation, for example, the Eleventh Circuit has remarked that "[a]s a general rule, summary judgment is not a proper vehicle for resolving [Title VII] claims . . . which often turn on an employer's motivation and intent." *Delgado v. Lockheed–Georgia Co.*, 815 F.2d 641, 646 (11th Cir.), *reh'g denied*, 820 F.2d 1231 (1987). Yet courts often enter judgment as a matter of law in employment discrimination lawsuits that rest on circumstantial evidence if no reasonable juror could find that the defendant intended to discriminate against the plaintiff. *See, e.g, Combs v. Plantation Patterns*, 106 F.3d 1519, 1538–43 (11th Cir. 1997).

All that being said, it seems incomplete to describe the PSC's application as an "ordinary" summary judgment motion. We recognize that the motion has substantial implications for American Airlines as well as the roughly 160 individual Plaintiffs who have sued on behalf of the victims of Flight 965. For this reason, and given the lack of direct precedent for the ruling we make today, the Court has undertaken a painstaking scrutiny of the parties' submissions, and devoted the better part of four days to argument and close questioning on the issues of negligence, willful misconduct and causation. Summary judgment motions are never entered lightly, and this case is surely no exception. In the end, though, what makes this case unique, and so powerfully supports the entry of summary judgment in favor of the Plaintiffs, is not just the pervasiveness of the pilots' misconduct, but American Airlines' multiple, express *admissions* about this misconduct and its consequences under the applicable law. Even drawing all reasonable inferences in favor of American, and focusing only on the *most* egregious of a series of acts that, standing alone or in the aggregate, might also support summary judgment, there is only one fair result on this record, and nothing in Rule 56 permits a Court to abdicate its responsibility under these circumstances.

## IV.

■ At the outset, it is vital to clarify precisely what "willful misconduct" signifies in the passenger cases.[11] The parties agree that the meaning of willful misconduct as used in the Warsaw Convention remains a question of federal law. Our analysis begins with the Eleventh Circuit's opinion in *Butler v. Aeromexico*, 774 F.2d 429 (11th Cir.1985). In *Butler*, the court addressed the defendant carrier's argument that the conduct of its crew did not amount to willful misconduct. The court disagreed, and offered the following comments:

> The term 'willful misconduct' . . . has been interpreted in *Koninklijke Luchtvaart Maatschappij N.V. v. Tuller*, 292 F.2d 775, 778–79 [ (D.C.Cir.), *cert. denied*, 368 U.S. 921 [82 S.Ct. 243, 7 L.Ed.2d 136] (1961) ], by a panel of which retired [Supreme Court] Justice Reed and future Chief Justice Burger were members, as meaning 'the intentional performance of an act with [1] knowledge that the . . . act will probably result in injury or damage' *or* [2] 'reckless disregard of the consequences' *or* [3] 'a deliberate purpose not to discharge some duty necessary to safety.' "

*Id.* at 430 (emphasis and brackets supplied).[12] The first and third theories for proving willful misconduct plainly require the jury to consider the state of mind of the pilots, although the third theory requires a far more culpable mental state. The parties disagree about whether the phrase "reckless disregard of the consequences" also contemplates an inquiry into the pilots' state of mind. The PSC asserts that "reckless disregard" creates an objective standard that does not turn

---

11. The standard for negligence under Florida law, which controls the claims of the cabin crew Plaintiffs, is discussed at page 1150 of this Order.

12. Although American suggests otherwise, *Butler* does not require proof of the intentional performance of a "wrongful" act, as opposed to simply performance of "an act. . . ."

on whether the pilots actually perceived the likely consequences of their intentional acts when they performed these acts. According to the PSC, to prevail on this theory, the plaintiffs must show not just mere negligence, but an extreme deviation from the standard of care in the face of a plain and obvious danger.

American counters that, the phrase "reckless disregard for the consequences" requires an examination of the state of mind of the pilots, in order to ascertain if the pilots apprehended that their conduct posed a risk of harm. American concedes, as it must, that the PSC may use circumstantial evidence to show the pilots' state of mind, but insists that we must inquire into what the pilots thought and perceived at the time of the alleged deviations from the standard of care. As support for its position, American relies almost entirely on *Saba v. Compagnie Nationale Air France*. In that case, which arose out of damage to a shipment of cargo, a majority of a panel from the United States Court of Appeals for the District of Colombia Circuit ostensibly construed "reckless disregard" to require a finding that the defendant acted improperly despite being aware of the damage that likely would result from its misconduct. The majority began by explaining that the courts "have never been very clear as to what we mean[ ] by reckless disregard," and then acknowledged that recklessness can have a subjective as well as an objective dimension:

> There is a continuum that runs from simple negligence through gross negligence to intentional misconduct. Recklessness, or reckless disregard, lies between gross negligence and intentional harm. The critical analytical division between the tort that can be made out through presentation of merely objective evidence—without regard to the defendant's state of mind—and one that requires a showing of a subjective state of mind cuts recklessness in half. One meaning of recklessness, then, is simply a linear extension of gross negligence, a palpable failure to meet the appropriate standard of care. The second ... is a legitimate substitution for intent to do the proscribed act because, if shown, it is a proxy for that forbidden intent. If it were

not used as a proxy, it might be all too easy for the wrongdoer to deliberately blind himself to the consequences of his tortious action. [As under the securities laws], reckless disregard, in the Warsaw Convention context, requires a showing that the defendant engaged in an act that is known to cause or to be likely to cause an injury.

78 F.3d at 668–69. The court stressed that this subjective standard could not be met merely by showing "an extreme departure from standards of ordinary care."

> That would be nothing more than gross negligence. [I]f it can be shown that a defendant gazed upon a specific and obvious danger, a court can infer that the defendant was cognitively aware of the danger and therefore had the requisite subjective intent. Intent can, of course, always be proved through circumstantial evidence. That is by no means the same thing as saying that the defendant should have known about the danger[. In this case w]e read the Warsaw Convention to limit liability in "situations where a reasonable employee should have but did not understand that her actions posed a substantial risk of harm to a shipper's goods.

*Id.* at 669. The majority acknowledged that this standard might make it more difficult for plaintiffs to avoid the Convention's limitations on liability, but "the signatories obviously thought the economics of air travel, and therefore the overall welfare of passengers, dictated those limitations [and] it simply will not do for courts to chip away at that liability limit, out of a natural desire to remedy the negligence that can be all too apparent in any individual case." *Id.* 671.

Judge Wald, in a persuasive dissent, criticized the majority's ostensible approval of a subjective definition of recklessness, suggesting that the majority's analysis created a standard that differs little, if at all, from the objective definition of recklessness applied in prior precedent. As Judge Wald put it, since under the majority's view a plaintiff may use circumstantial evidence to convince a jury to *infer* that the defendant was subjectively aware of the likely negative consequences of

its act, there is no palpable difference between this ostensibly subjective inquiry and allowing a plaintiff to prove objective recklessness by showing that the defendant's conduct deviated significantly from the standard of care in the face of a plain and obvious danger. *Id.* at 674–75. In other words,

> the majority's "subjective" standard of reckless disregard requires awareness by the carrier of the likely consequences of its actions, but permits an inference of that state of mind from circumstances in which the carrier departs in an extreme fashion from standards of ordinary care. I agree that either direct or circumstantial evidence of this kind of heedless indifference may suffice to show reckless disregard. A de minimis departure from standards of ordinary care would not suffice.... But my basic problem is that this is already the law, the same law we have long applied in this court....
>
> [I]n practice, the subjective test will never stray far afield from the objective one. If the majority concedes the legitimacy of an inference of subjective knowledge of consequences from extreme circumstances, the dividing line between these two standards all but evaporates. *Since intent can be inferred from the circumstances, what we are really saying to the parties is that if your behavior deviates substantially from the norm, we will assume that you knew your actions created a very substantial risk of harm to others.*

*Id.* at 673, 675 (Wald, J., dissenting) (emphasis added).

We find little support in *Saba* for American's argument. To begin with, and of paramount importance, it is *Butler,* not *Saba,* that we are unequivocally bound to follow here. Contrary to American's suggestion, the *Butler* opinion does not adopt whatever definition of willful misconduct is currently used in the District of Columbia Circuit; rather, *Butler* approves a specific definition from a specific opinion, *Tuller,* authored by a specific panel in that Circuit. Moreover, as Judge Wald observed, Judge Silberman's majority opinion, although at times professing to adopt a wholly subjective standard of recklessness, becomes much cloudier upon close examination.

Whatever the intention of the majority, *Saba* plainly does not adopt a purely subjective "actual knowledge" standard. For purposes of comparison, consider the Supreme Court's opinion in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In *Farmer,* the Court refused to apply the standard for objective recklessness, and instead held that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official "knows of and disregards an excessive risk to inmate health and safety." *Id.* 837, 114 S.Ct. at 1979. The Court emphasized that, due to the subjective nature of the inquiry, the official "must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference." Id.* (emphasis added). The *Saba* majority, by contrast, expressly acknowledges that the requisite subjective element can be *presumed,* even if the plaintiff cannot prove that the defendant realized its actions were likely to cause harm, so long as it "can be shown that a defendant gazed upon a specific and obvious danger." 78 F.3d at 669 (emphasis added). The reason for this, concedes the majority, is that otherwise "it might be all too easy for the wrongdoer to deliberately blind himself to the consequences of his tortious action." *Id.* 668. But a defendant's conduct, says *Farmer,* is *objectively* reckless when the tortfeasor "acts or ... fails to act in the face of an unjustifiably high risk of harm that is either known or *so obvious that it should be known." 511 U.S.* at 836, 114 S.Ct. at 1978. The difference between the quoted passage from *Saba* and *Farmer'*s definition of objective recklessness is difficult to ascertain. Indeed, the *Farmer* court indicated that it "would be hard to describe [an] understanding of [recklessness] permitting liability to be premised on obviousness ... as anything but objective." *Id.* 841, 114 S.Ct. at 1981.[13] In short, *Saba* does

---

**13.** The Supreme Court made this remark in reference to *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), which states that a municipality can be liable for failing to

not write objective analysis out of the willful misconduct inquiry.

During oral argument, American suggested that the *Saba* majority's use of the phrase "gazed upon" requires some level of cognition on the part of the defendant, and thereby suggests that the defendant must actually "process" or "register" the obvious danger. This construction of *Saba* has no foundation in the opinion, and is not consistent with the plain meaning of the word "gaze." More to the point, the reference to "gaze[ ] upon a specific and obvious danger" is simply an "in other words" description of language appearing in *SEC v. Steadman*, 967 F.2d 636, 641–42 (D.C.Cir.1992), a securities fraud case which does not demand direct proof of the defendant's state of mind, and instead holds that recklessness can be found where there is "an extreme departure from the standards of ordinary care ... which presents a danger ... that is either known to the defendant *or is so obvious that the actor must have been aware of it* " (emphasis added). The most that can be said about *Saba*, therefore, is that like *Steadman* it holds that subjective recklessness can, although not necessarily must, be inferred from a showing of objective recklessness. We agree with Judge Wald that this point adds little, if anything, to the prior interpretations of "reckless disregard" as a formula for proving willful misconduct under the Warsaw Convention.[14]

 In any event, we reiterate that we are not writing on a blank slate. *Butler* acknowledges that willful misconduct may be proved in one of *three* ways: by showing the intentional performance of an act (1) "with knowledge that the ... act will probably result in injury or damage"; (2) with "reckless disregard of the consequences"; or (3)

with "a deliberate purpose not to discharge some duty necessary to safety." The first theory is a pure subjective inquiry similar to that applied in *Farmer.* Accordingly, if "reckless disregard," as used in the second prong of *Butler,* is construed to mean subjective recklessness, as American asserts and *Saba* ostensibly suggests, then it adds absolutely nothing to the first theory recognized by *Butler.* Similarly, if reckless disregard as used in the second prong of *Butler* is construed to incorporate the hybrid subjective/objective inquiry approved in *Steadman,* then this theory has significance independent from the first prong of *Butler* only to the extent that proof of objective recklessness may be used as a substitute for proof of the defendant's state of mind. Simply put, therefore reading the second theory, "reckless disregard of the consequences," to require a jury to make a specific finding that the defendant recognized that its acts were likely to cause harm renders the second theory largely, if not entirely, superfluous. In other words, this reading defeats the Circuit's instruction that there are three alternative theories for establishing willful misconduct. Courts have often recognized that statutory language should be read in a way that does not render certain language unnecessary or redundant. *See, e.g., United States v. Canals–Jimenez,* 943 F.2d 1284 (11th Cir. 1991). The same principle guides us here in our interpretation of binding precedent.

Our reading of *Butler* is supported by the Eleventh Circuit's analysis of the facts in that case, which arose out of an airplane that crashed while attempting to land in poor weather. The court summarized the facts from which the district court "might properly draw the inference that the crew had intentionally performed acts with knowledge that

train its employees if the plaintiff can establish deliberate indifference; in other words, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"—whatever their state of mind. 511 U.S. at 840, 114 S.Ct. at 1980–81.

**14.** Nor does the majority's observation that the Convention limits liability where the defendant

" 'should have but did not understand that its actions posed a substantial risk of harm ...,' " *Credit Francais Intern. v. Bio–Vita, Ltd.,* 78 F.3d 698, 699 (1st Cir.1996), have a great deal of meaning here, because like Judge Wald, the PSC acknowledges that, to prove willful misconduct using an objective recklessness standard, it must do more than show that the pilots "should have but did not understand that [their] actions posed a substantial risk of harm." It must also show an *extreme* departure from the standard of care.

under the circumstances injury might result." 774 F.2d at 431. The court noted that, early in the flight, the crew knew that there were clouds in the vicinity of the airport that "*should have been* monitored...." *Id.* Nevertheless, the radar was turned off and not used, even though "[t]he pilot saw or *could have seen* severe weather in the vicinity of the airport before the radar was deactivated." *Id.* court explained that there was an "inference sustained by substantial evidence" that after the crew lost visibility on its descent, it continued to descend "with knowledge that such procedure would probably result in injury to passengers," since "[i]t was their duty to assume that visibility would remain obscured and to execute a missed approach as soon as they encountered loss of visibility...." *Id.* Most telling, however, is the court's conclusion that the district court's findings regarding what the pilots knew or could have known "were based on objective analysis of the recorded data, the exhibits and the opinions of experts rather than on subjective evaluation of the credibility of the crew based on observation of their demeanor." *Id.* 432. At very least, *Butler* supports the proposition that willful misconduct may be established in a pilot error case even where there is contrary direct evidence of the crew's state of mind. More to the point, language in the opinion, including but not limited to its references to what the pilots should or could have known, suggests that willful misconduct may indeed be established through proof tantamount to objective recklessness.

Equally revealing is the fact that *Tuller,* the single case invoked by *Butler* for its definition of willful misconduct, sustains multiple findings of willful misconduct on a theory of reckless disregard without any clear suggestion that the defendant's employees

actually appreciated the harm that likely would result from their conduct. *Tuller* involved the claim of a passenger who drowned after an airplane crashed into a river at the end of a runway. The court found various acts of misconduct on the part of the airline's employees or agents, including among other things a failure to instruct passengers about the location of lifejackets. The court held that "[i]n view of the gravity of the harm which would follow an emergency landing on water on a night flight which contemplated landings and take-offs at at least two airports near the sea, the jury could find that the failure of [the airline] to establish and execute procedures to instruct passengers as to the location and use of life vests was a conscious and wilful omission to perform a positive duty and constituted reckless disregard of the consequences." 292 F.2d at 779. The court made no finding concerning the state of mind of the individuals who failed to "establish and execute procedures" for instructing passengers about the lifejackets. The *Saba* majority attempts to diminish the precedential value of *Tuller* by suggesting that the conduct at issue in that case may not have amounted to anything more than negligence. Not only is this assumption unclear from the *Tuller* opinion, then-Judge Burger's emphasis on the "gravity of the harm" and potential danger associated with the emergency landing process suggests that he found something more than an ordinary breach of duty. In any event, we are concerned only with what light *Tuller* sheds on the phrase "reckless disregard" as adopted by the Eleventh Circuit in *Butler.* The fact that *Tuller* appears to apply an objective standard suggests that a rigorous objective inquiry certainly has a place in the determination of willful misconduct.[15]

**15.** American is incorrect is its suggestion, made at oral argument, that the *Tuller* court "described how the actors knew subjectively that there was a wrongful act and that injury was likely to occur." Tr. of August 18th Hrg., at 57. Of the multiple separate acts of willful misconduct discussed in the opinion, in only one instance—when referring to the crew's failure to facilitate the victim's rescue—did the court even arguably suggest that the defendant's employees may have had knowledge of the likely harm from their conduct. 292 F.2d at 780 ("The jury could

reasonably find that ... the failure to take available steps to provide for Tuller's safety was a conscious omission made with reckless disregard of the consequences when it was known he was in a position of peril"). By contrast, the court's discussion of the loss of communication between the plane and the ground does not contain any finding as to whether the responsible employees realized that their failure to maintain or restore radio contact was likely to cause harm. *Id.* at 780–81. Similarly, the court's discussion of the failure to communicate an emergency message to

Construing "reckless disregard" as tantamount to objective recklessness also makes sound practical and policy sense. If an airline's employees are exposed to a plain, palpable and certain danger, and nevertheless intentionally perform acts that deviate substantially from the acknowledged standard of care, the absence of proof that they subjectively recognized the harm that likely would result from their conduct does not make them a great deal less culpable. Moreover, in pilot error cases where the responsible actors perish and evaluations of the pilots' state of mind are necessarily speculative, it may impose an inordinate burden on accident victims or their heirs to have to prove by a preponderance of the evidence what the pilots were thinking, or what they knew, when they committed otherwise obvious acts of misconduct. Courts in this Circuit have recognized that a purely subjective inquiry into a party's state of mind, without any gloss of objective reasonableness, may lead to absurd results. *See, e.g., William Penn Life Ins. Co. v. Sands,* 912 F.2d 1359, 1364 (11th Cir. 1990) (holding that, when an insurer seeks to rescind a policy based on the alleged inaccuracy of information supplied to the best of the insured's "knowledge and belief," a court may find a particular representation false as a matter of law, however sincerely it may be believed, if the belief is unreasonable, since " '[t]o conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception—persons who having witnessed the Apollo landings, still believe the moon is made of cheese' ") (quoting *Skinner v. Aetna Life & Cas.,* 804 F.2d 148, 149–51 (D.C.Cir. 1986)).

We have no quarrel with the *Saba* majority's suggestion that "[i]t simply will not do for courts to chip away at th[e Warsaw Convention's] liability limit, out of a natural desire to remedy the negligence that can be all too apparent in any individual case." But the test for reckless disregard proposed by the PSC is not a negligence or even gross negligence inquiry: it requires not just a breach of the standard of care, but an *extreme* departure from the applicable standard, *as well as* a plain and obvious risk of

death or serious injury under the circumstances. Moreover, if the goals of the Convention can only be served by construing the exception to the liability limit as narrowly as possible, then courts could have defined "willful" misconduct solely in the criminal law sense of conduct perpetrated with an "bad purpose either to disobey or disregard the law," Eleventh Cir. Dist. Judges Ass'n, Pattern Jury Inst: Criminal Cases, Basic Inst. No. 9.1 (1985). While *Butler* recognizes that willful misconduct may be established on this theory, plainly it recognizes that other, less exacting theories may be used instead. For all of the foregoing reasons, we construe the term "reckless disregard," as that phrase appears in *Butler,* to permit a plaintiff to prove willful misconduct by showing that the defendant's conduct amounted to an extreme deviation from the standard of care under circumstances where the danger of likely harm was plain and obvious, even if the defendant's employees—because they deliberately blinded themselves, deluded themselves or simply "fell asleep"—never fully apprehended the danger created by their conduct. As indicated below, however, we are convinced that summary judgment clearly is warranted here *even* if the inquiry is purely subjective.

## V.

◼ The crux of the PSC's summary judgment motion is a claim that the pilots of Flight 965 demonstrated willful misconduct by continuing to descend the aircraft even though it veered wildly off course. Although the Plaintiffs identify many other errors by the pilots, we focus on this issue, not only because the accident would have been avoided if the pilots had elected to suspend the descent once Flight 965 began its sharp turn to the east and flew out of the valley, but also because no other act so convincingly, and so powerfully, supports the entry of summary judgment.

The American Airlines Flight Manual in effect at the time of the crash unequivocally required that, once an aircraft is off the

the control tower in the wake of the accident contains no specific finding with respect to the

state of mind of the responsible employees. *Id.* at 780.

published arrival or approach path, the pilots must not descend below the last assigned altitude. Specifically, "[w]hen operating on an unpublished route ... the pilot, when an approach clearance is received, shall maintain the last altitude assigned until the aircraft is established on a segment of the published route." PSC Mot., exh. 11, § 10, p. 14. This rule reflects FAR § 91.175, which in pertinent part states that, "[w]hen operating on an unpublished route ... the pilot, when an approach clearance is received, shall ... maintain the last altitude assigned to that pilot until the aircraft is established on a segment of a published route or instrument approach procedure unless a different altitude is assigned by ATC." *Id.*, exh. 27. More generally, but just as critically, American Airlines pilots are forbidden from continuing to descend if they have a doubt about their position in the sky or if they do not know "exactly where they are." *See, e.g., id.*, exh. 8., at 79; exh. 17; exh. 18, Rauhofer dep., at 82.

As noted above, the Defendant does not, and cannot dispute, that Flight 965 was off the published route from approximately 21:37:40, when the "R" was entered and the aircraft began its turn to the left, until the collision with terrain at approximately 21:41:28. The Rozo 1 STAR—assigned by the ATC at 21:36:43 and accepted by the pilots at 21:36:52—called for the pilots to fly south over, and report from, the Tulua VOR, then proceed south along the 202° radial to the D21 CLO waypoint, and then pick up the 193° radial to the Rozo NDB. The VOR DMR Rny 19 approach similarly began at Tulua. At no point after 21:37:40 did Flight 965 ever establish itself on the applicable published arrival or approach path. *See, e.g.*, PSC Mot., exh. 25, McFall dep., at 619.

Nor does the Defendant dispute that throughout this period, the pilots continued to descend the aircraft without interruption, except during flight's final seconds after the terrain warning sounded. At 21:37:40 (when the "R" command was executed), the altitude was 16,880; at 21:38:28 (with the left turn well underway), the altitude was 15,616; at 21:39:18 (when the plane began to turn back toward the right), the altitude was 13,132.

The record indicates that Flight 965 descended as low as 8480 feet before the pilots began their abrupt and unsuccessful attempt to ascend over the terrain. The crash, as noted above, occurred with the aircraft approximately 8900 feet above mean sea level.

On the basis of these facts, the PSC served a request for admission on American Airlines which read: "At approximately 21:39:00 from an off course position, the flight crew knowingly elected to continue to descend while trying to maneuver the aircraft to intercept the published ULQ/Rozo NDB/CLO approach course to Runway 19 at the Cali airport." The Defendant *admitted* that this statement was correct. From the PSC's perspective, this admission, standing alone, requires the entry of summary judgment, since it amounts to a concession that the pilots knew they were off course and nevertheless chose to descend. Rule 56 itself recognizes that admissions may be considered in resolving summary judgment motions. *See* Fed. R.Civ.P. 56(c); *United States v. 2204 Barbara Lane,* 960 F.2d 126, 129 (11th Cir.1992). American, however, suggests that it admitted nothing more than that the flight was off course and that the pilots knowingly elected to descend; in other words, says American, there has been no concession that the pilots *knew* they were off course while they continued the descent, and therefore summary judgment is improper on this basis.

The Defendant's cramped view of its admission is not altogether convincing. To begin with, the PSC had little reason to serve this request if all it sought was an acknowledgment that the plane was off course and a concession that the pilots were descending the plane knowingly (as opposed to unwittingly). If American did not intend to concede that the pilots knew they were off course, it should have recognized that the request was highly susceptible to this interpretation and simply have denied the request as phrased or "set forth in detail the reasons why [it could not] truthfully admit or deny the matter." Fed.R.Civ.P. 36(a). Indeed, the Defendant did just that in response to several other requests for admission served by the Plaintiffs. After all, the point in time denoted in the request—"approximately

21:39:00"—was not chosen accidentally; it was roughly the moment when both Tafuri and Williams made comments plainly suggesting that they realized the plane was not where it was supposed to be. In any event, it is difficult to imagine how the flight crew could have been "maneuver[ing] to intercept" the published route without first realising that they were off the published route and needed to intercept it, since the aircraft was not, at least at that point, flying itself. Notwithstanding the PSC's invitation to do so, however, we do not resolve the pending motion solely, or even in substantial part, on the Defendant's admission. That being said, the admission confirms two critical and obvious facts, the flight was off course and the pilots were continuing to descend, and at the very least provides one more piece of evidence that would preclude a reasonable juror from concluding that the pilots never apprehended that Flight 965 had veered off the published route.

A finding that the pilots knew, or plainly must have known, that Flight 965 was off course is an essential predicate to a finding of willful misconduct in this context, and it is the principal issue controverted by American. To reiterate, under the law of this Circuit, and in this context, a showing of willful misconduct requires proof that the pilots of Flight 965 either (1) committed an intentional act with knowledge that harm was likely to result; or (2) demonstrated a reckless disregard of the consequences—in other words, committed an extreme violation of the standard of care in the face of a plain and obvious danger. The first of these inquiries is essentially subjective, while the second is largely objective.

Before going further, though, we must address a threshold inference that American Airlines asks us to draw, since this inference shapes our analysis of the pilots' continued descent. It is American's position that, contrary to the PSC's argument, the pilots of Flight 965 did not intend to abbreviate the Rozo 1 STAR by bypassing Tulua and instead flying direct to Rozo. From the Defendant's perspective, the pilots, at least until the last two minutes of the flight, intended to pass over the Tulua VOR, and believed they were on the published course to do just that.

There is some evidence to substantiate the Defendants' view that the pilots did not intend to follow a short-cut to the Cali airport. To begin with, the Rozo 1 STAR does not begin at the Rozo NDB; rather, it begins at the Tulua VOR, and ends at the Rozo NDB. American asserts that this anomaly is contrary to international conventions, and may explain why, at 21:37:29, Tafuri asked the ATC for permission to "go direct Rozo" when he really meant to say "go direct Tulua" and *from there* follow the Rozo 1 STAR. After all, says the Defendant, the remark "Can American 965 go direct Rozo and then do the Rozo arrival" makes little sense on its face, since the Rozo 1 STAR ends at Rozo. As American sees it, Williams (not Tafuri) typed what he thought was the identifier for Rozo, out of a similarly mistaken assumption that the Rozo 1 STAR began at Rozo. American adds that, if the pilots intended to bypass Tulua and fly direct to Rozo, then their subsequent, repeated efforts to locate the Tulua VOR are difficult to understand.

There are significant holes in American's argument, even if we accept that Tafuri could have misspoken not once, but twice (since he referred to Rozo again at 21:37:42). It is extremely unclear why Tafuri would have sought permission to "go direct [Tulua]." American suggests we can infer that the pilots, at this point, were still operating under the assumption that they were cleared on a direct route to the Cali VOR and therefore needed ATC approval before heading to Tulua. But the very last instruction from the ATC, less than 30 seconds earlier, at 21:36:58, was "Report ... Tulua VOR." This instruction, expressly acknowledged by Tafuri, was given in conjunction with the new clearance to land on Runway 19 after taking the Rozo 1 arrival path. There is little room for argument that, whatever the pilots may have believed about the appropriateness of a direct path to the Cali VOR prior to 21:36:43, at that point they recognized that they were required to follow the ATC's command to use the Rozo 1 STAR. There are other patent inconsistencies in the Defendant's position. As the PSC observes, the fact that Tafuri

attempted to "tune" in the radio frequency for the Rozo beacon at 21:38:01 cannot easily be squared with the notion that Tafuri, at that point, really meant to fly to Tulua. Moreover, the "go direct [Tulua]" request came immediately after a conversation between Tafuri and Williams in which the pilots, apparently looking at the charts, observed that Rozo "comes off Tulua." Proof that the pilots continued to search for Tulua after the "direct to Rozo" request may show nothing more than the pilots' second thoughts about abbreviating the Rozo 1 STAR. Flight 965 was behind schedule, and portions of the CVR arguably can be read to suggest that pilots were concerned about this delay. And of paramount importance, the Defendants' speculation about the pilots' state of mind is largely incompatible with what was actually said and done in the cockpit. For present purposes, though, it is enough for us to observe that, if we accept American's generous reading of the evidence, the pilots necessarily intended to fly the Rozo 1 STAR and understood that they were expected to follow the published route to Tulua and begin the Rozo 1 STAR at that point. This point is critical, since American's position collapses if the proof establishes that the pilots continued their descent once they knew, or plainly must have known, that Flight 965 was no longer on this route.

### A.

We begin with the issue of objective recklessness. As noted above, the applicable standard of care, reflected in American Airlines' own policy, explicitly forbids pilots from continuing to descend if they are meaningfully off the published arrival and approach route or if they do not know where they are. No reasonable jury could conclude the pilots of Flight 965 complied with *either* of these rules. The record makes plain, and indeed American has acknowledged, that the aircraft was off course for roughly the final four minutes of the flight, but nevertheless

continued to descend. And the deviation was not insubstantial, as American concedes.[16]

Moreover, the record makes plain that Flight 965 descended well below 15,000 feet—the last altitude clearance supplied by the Cali ATC—and in so doing violated the standard of care embodied in FAR § 91.175, which as noted above forbids pilots from descending below the last cleared altitude before being established on the published route. The clearance to 15,000 feet came at 21:35:14, and was expressly acknowledged by Tafuri:

21:35:14

Tafuri Okay, understood cleared direct to Cali VOR uh, report Tulua and uh, that altitude one five, that's fifteen thousand, three zero zero two, is that all correct sir?

21:35:25

ATC Affirmative

21:35:27

Tafuri Thank you

American maintains that, two minutes later, when the ATC approved the Rozo 1 STAR and the approach to Runway 19, he superseded the prior instruction and gave Flight 965 permission to descend as low as 5000 feet. The Defendant concedes that the ATC never said quite this; nevertheless, it argues that a reasonable jury could infer that a lower altitude was in fact assigned. The exchange highlighted by American reads as follows:

21:36:31

ATC Kay sir, the wind is calm, are you able to approach Runway One Niner?

21:36:36

Tafuri Would you like to shoot the One Nine straight in?

21:36:38

Williams Uh, yeah, we'll have to scramble to get down, we can do it

---

16. *See, e.g.,* Tr. of August 25th Hrg., at 40:
Court: There is no dispute that they were plainly far off course, right?
Counsel: Correct.
Court: The only question is what did they know or perhaps what they should have known

under the circumstances? But plainly they were way off course. They were headed in 90 degrees the wrong direction, right?
Counsel: That's correct, your Honor.

21:36:40

Tafuri Uh, yes sir, we need lower altitude right away though

21:36:43

ATC Roger, Nine Six Five is cleared to VOR DME approach to Runway One Niner, Rozo Number One arrival, report Tulua VOR

21:36:52

Tafuri Cleared the VOR DME to One Nine, Rozo One uh, arrival, we'll report the VOR, thank you sir

21:36:58

AT Report uh, Tulua VOR

21:37:01

Tafuri Report Tulua....

21:37:29

Tafuri Uh, can, American Airlines uh, Nine Six Five go direct to Rozo and then do the Rozo arrival sir?

21:37:36

ATC Affirmative, take the Rozo One and Runway One Niner, the wind is calm

21:37:42

Tafuri Alright, Rozo, the Rozo One to One Nine, thank you, American Nine Six Five

21:37:46

AT Affirmative, report Tulua on uh, twenty-one uh, miles uh, five thousand feet

21:37:53

Tafuri Okay, report Tulua at twenty-one miles and five thousand feet, American Nine uh, Six Five....

The Defendant suggests that the comment "report Tulua on uh, twenty-one uh, miles uh, five thousand feet" could reasonably be construed as a clearance to descend to 5000 feet. This authorization makes sense, according to American, if we assume that the ATC construed Tafuri's request to go "direct to Rozo" as just that (a request to bypass Tulua and go straight to the Rozo NDB), since the aircraft would have to make a relatively quick descent in order to be at an appropriately low altitude when passing the Rozo beacon. Indeed, says American, the ATC knew that a lower clearance was required, due to Tafuri's observation that Flight 965

could do the Runway 19 approach if given a "lower altitude right away."

There are multiple flaws with this theory. Initially, and most fundamentally, the ATC plainly did not say that Flight 965 was cleared to 5000 feet. American supplies us with no basis to believe that an instruction to "report" at a certain point or points is considered the equivalent to modifying an altitude restriction. The term "report" has a plain and distinct meaning in this context, as evidenced by the ATC's three prior instructions to "Report Tulua," and if the ATC intended to clear Flight 965 to descend down to 5000 feet, he surely could have said so expressly. Moreover, if American is correct in its interpretation of what the ATC meant to say, then literally Flight 965 could have *immediately* dipped to 5000 feet, from any point in the sky. But even the Defendant acknowledges that the pilots could not do quite that. For example, Murray Daigle, one of the Defendant's experts, explained that the ATC did not clear Flight 965 to descend to 5000 feet from any point in the sky since this clearance would apply only if the aircraft was established on the approach. Daigle dep., at 133. The Defendant's pilot expert, Jeff Noe, likewise conceded that Flight 965 was not cleared to 5000 feet unless the pilots were established on the approach. PSC Mot., exh. 21, at 143. Daigle, as well as American's counsel at oral argument, added that Flight 965 could not have dropped to 5000 feet, let alone below 15,000 feet, before the pilots reported that they had passed over Tulua. *Id.*, exh. 34, at 214; Tr. of August 25th Hrg., at 35. Given these limitations, it is simply not plausible to suggest that the ATC intended to amend his prior instruction by giving Flight 965 unlimited license to drop below 5000 feet from any point in the sky.

The very *most* that can be inferred, therefore, is that the ATC cleared the airplane to 5000 feet so long as it was following a direct path to the Rozo NDB. Dep. of Manuel Hugonnett, at 106–07. But we are not convinced that any reasonable juror could infer that the ATC meant to assign to Flight 965 a direct path to Rozo, since his comment "report Tulua" is completely inconsistent with the notion that the aircraft would be travel-

ing straight to Rozo.[17] Without question, the most plausible interpretation of what the ATC meant to say is that he wanted Flight 965 to follow the Rozo 1 STAR and report at Tulua as well as at the D21 waypoint, which is located 21 miles from the Cali VOR and at which aircraft are supposed to be no lower than 5000 feet. This is consistent with the different meaning of "direct" in Latin American, and indeed, the initial CVR transcript actually reads "Report Tulua *and* 21 miles, ah 5 thousand" (emphasis added).[18] We need not conclusively accept this interpretation to highlight the weakness in American's position, though. The Defendant at one point suggests that the ATC may have misspoken when he said "report Tulua" because he really meant to authorize a direct flight to Rozo. But it simply strains credulity too far to maintain that, within a span of several seconds, both Tafuri and the ATC meant something other than what they plainly and unequivocally said. In short, the inferences suggested by American are not reasonable, and no rational juror could find that Flight 965 was officially cleared to descend below 15,000 feet. In any event, even if a jury could infer that the ATC truly did permit Flight 965 to descend to 5000 feet from any point in the sky (let alone if the most a jury could infer is that the ATC permitted the aircraft to descend to 5000 feet when approaching "direct to Rozo")—in short, *even if* we *accept* the Defendant's arguments—it would be no less egregious a breach of American Airlines policy if the pilots continued to descend without knowing where they were or if the pilots continued to descend while the aircraft was off the airway to the east of the valley. *See also infra,* at 88–89.

Of the greatest importance is the fact that the pilots' continued descent, notwithstanding the aircraft's off course position, was no forgivable or insignificant breach of the various standards of care; it was, instead, an extreme deviation from the conduct required by the relevant circumstances, and no rea-

sonable juror could conclude otherwise. During the approximately four minutes that elapsed between the entry of "R" into the FMC and the crash, Flight 965 descended from just under 17,000 feet to almost 8000 feet, a substantial and prolonged drop in altitude that brought it closer and closer to the high terrain below. The descent did not reflect a single, isolated miscalculation; rather, the pilots elected to continue the descent without interruption until the final ten seconds of the flight. They had repeated opportunities and more than ample time to suspend the descent and, if not ascend, at least maintain a level altitude until the aircraft established itself on the airway. There is simply no basis to describe this choice as a minimal departure from the standard of care embodied in American Airlines policy and the FAR's. It was an act of grievous malfeasance that powerfully supports a finding of recklessness.

We come, therefore, to the critical question of whether the danger of continuing to descend under these circumstances was so profound, and so obvious, we can "infer" the pilots recognized that their conduct was likely to lead to injury. No one can dispute that, if indeed it was obvious that the aircraft was off course (and specifically, to the east of the valley), the deadly risks associated with continuing to descend while attempting to navigate the mountainous terrain surrounding the airport would be equally patent. The charts consulted by the pilots during Flight 965's final minutes made absolutely plain the presence of high mountain peaks and ridges on either side of the valley. More to the point, both Tafuri and Williams had been trained to recognize the danger posed by high terrain to aircraft landing at Latin American airports. As one training manual made clear, "knowing where you are in the terminal area, around the dangerous high terrain airports of Central and South America, can be vital [since t]he tolerances get finer and finer as you get into high moun-

---

17. Keep in mind that at this point, according to American, the pilots intended to fly to Tulua and did not intend to fly direct to Rozo, so permission to descend to 5000 feet on a direct path to Rozo would (using the Defendant's logic) have been of no moment.

18. The CVR tape convincingly supports the language that appears in the original transcript.

tains." PSC Mot., exh. 8, at 72. Simply put, no reasonable juror could say that the danger of continuing to descend from a position substantially off the published arrival path to the Cali airport would be anything other than obvious to pilots under these circumstances.

Nor, we conclude, could a reasonable juror find that the aircraft's deviation from the published arrival path would be anything other than obvious to pilots in the position of Tafuri and Williams. American has attached a great deal of importance to its suggestion that however off course Flight 965 became, and remained, during the final four minutes, the pilots continually believed the aircraft was on, or extremely near, the published route. Whatever the plausibility of this argument, which we discuss separately below, the crucial fact remains that virtually every navigational aid available to the pilots would have made *abundantly* clear that Flight 965, for most if not all of the final four minutes, was nowhere near the published route. And there is no doubt that the pilots were fully aware of just what the flight plan required and the published route entailed. *See, e.g.,* PSC Mot., exh. 30, Trudeau dep., at 67–68; exh. 11, at § 3.5; Def. Resp. to PSC's Local Rule 7.5 Statement of Facts, at 14–15; Def. Resp., at 20 n. 33 ("American is entitled to the inference that statements by the crew reflect analysis and discussion of 'what the approach entailed' "). Nor is there any dispute that the Tafuri and Williams were required to, and indeed did, consult their charts during the final four minutes of the flight, and also examined the instruments in the cockpit. As American acknowledges, during the final minutes of the flight, "[t]he pilots were extremely busy reading and setting instruments ... and reading charts." Def. Resp., at 9; *see also id.* at 24 (reiterating that the pilots were examining their charts); PSC Mot., exh. 25, McFall dep., at 653–56 (noting the crew's duty to monitor the heading of the aircraft and instruments reflecting the changes in altitude).[19]

Multiple indicators would have made absolutely clear the discrepancy between the published route and the aircraft's location. First, American does not dispute that the cockpit contained no less than seven magnetic compasses (three in the vicinity of each pilot and one in the center) which would have reflected the over 90° left turn that occurred after entry of the "R" into the FMC. *See* Tr. of August 25th Hrg., at 42. When "R" was entered at 21:37:40, the aircraft's heading was 193.2°2. Within thirty seconds, at 21:38:10, the compass heading was down to 166°. At 21:38:40, one minute after entry of the "R", the compass heading was 135°. Forty seconds later, the compass heading had dropped to 100°. There is no room to dispute, therefore, that for a period of one minute and forty seconds, the seven compass headings in the cockpit made clear that the aircraft had been turning to, and flying sharply toward, the east and the mountain peaks. Although American has at times suggested that the pilots "failed to perceive" the left hand turn, during oral argument its counsel acknowledged that the pilots "had a lot of cues to tell them they were in a left-hand turn" and at least Tafuri eventually came to realize that the airplane was turning left. Tr. of August 25th Hrg., at 44. But the compasses did more than tell the pilots that the aircraft had veered to the left; they made absolutely clear just how sharp a turn had been made and how far off course they were.

Even a cursory glance at the charts would have made plain that the published route did *not call for incoming aircraft to be traveling on a heading anywhere near* 150°—let alone 140°, 130°, 120° 110° or 100°. And it was not just during the left turn that the compass heading provided obvious clues to the pilots; even *after* the aircraft began to turn back to the right, it was not until the final minute of the flight (almost eighty seconds after the right turn was initiated, and with the aircraft having dipped below 10,000 feet) that the heading reached 170°, and not until 21:40:50, less than forty seconds before the crash, did the heading return to 193°. Yet even at this point, American insists that the pilots did not have reason to believe the aircraft was off

---

**19.** The CVR transcript itself makes clear that both the flight plan and the approach plates for the Rozo One arrival were in the cockpit and consulted by the pilots. *See* Def. Resp., exh. 1, at 20–21, 34–36.

course. We are unconvinced. Indeed, not all of the Defendant's witnesses seem convinced. For example, during his deposition, Tommy McFall, the Defendant's "Managing Director for Safety," offered the following observations:

> Counsel: Is it not an absolute requirement for at least one of two pilots to recognize promptly when the aircraft is commencing a deviation from an approach course that ends up being perpendicular to the approach course they were properly supposed to be flying?
>
> McFall: Yes . . . .
>
> Counsel: *Pretty soon after the off course events begins to take place somebody in the cockpit has to recognize, "Hey, we are off course. We are going off course"?*
>
> McFall: *Someone should have recognized that, yes, sir . . . .*
>
> Counsel: How could one possibly not perceive that one was moving to a point 90 degrees off course?
>
> McFall: I don't know how that happened. I could not tell you how that happened . . . .
>
> Counsel: *When they reached a heading, a magnetic heading of 100 degrees. were they required, if they had their heads on the instruments, to see that?*
>
> McFall: To see that 100 degrees?
>
> Counsel: Yes.
>
> McFall: Well, once again, I have already acknowledged that *the crew should have been aware of their heading.*

PSC Mot., exh. 25, at 687–89 (emphasis added).

Moreover, the cockpit contains, on both sides, an instrument that reflects the degree of roll by the aircraft as it turns. Almost immediately after entry of the "R," this indicator reflected a bank angle to the left. By 21:37:51, eleven seconds later, the degree of roll was 18°, where it remained until, at 21:39:11, the pilots began to turn back to the right. It would have been clear, therefore, that the aircraft had made a substantial

turn—a turn that, by every objective measure, was completely incompatible with the published arrival and approach route.

American counters that, while the sharp left turn was underway, the course deviation indicator (D Bar) function of Captain Tafuri's EHSI screen, in VOR mode at the time, "would have led [him] to understand that . . . the course to Tulua was to their left, and that a turn to the left was acceptable." Def. Resp., at 47. American explains that, because at 21:38:36 Tafuri had mistakenly dialed 116.7 (the frequency for VVC, a waypoint located well to the east) into his VOR instead of the proper frequency for Tulua (117.7), the D Bar function, as well as the needles on the RDMI instrument, would have suggested that the aircraft had not yet traveled far enough south and east to reach Tulua.[20] American goes on to say that, once Tafuri correctly dialed the frequency for Tulua at 21:39:24, the D Bar moved to the bottom of the screen, suggesting that the aircraft had passed the intercept "very close to" Tulua and that therefore the plane needed to turn right, back to the west and towards the 2029 radial he had reason to believe he had just crossed.

But this theory suffers from several critical flaws. First and foremost, whatever the D Bar may have suggested, and even assuming that Flight 965 was approaching Tulua from the northwest side of the valley, there is simply *no way* to square a magnetic compass heading of 150°, *let alone* 120° or 100°, with what the charts portrayed as the appropriate route. Second, if Tafuri placed such heavy emphasis on the D Bar (to the exclusion of all other clues to the aircraft's true position), and the EHSI display in VOR mode indicated that the aircraft was still west of Tulua and the 202° radial (as American asks us to infer) until the captain correctly dialed the frequency for Tulua, why did he direct Williams, twenty seconds *beforehand*, to "come to the right . . ."? Although Ameri-

---

**20.** This misdialing of the Tulua frequency is yet another mistake identified by the PSC. At oral argument, American's counsel suggested that Tafuri may not have done anything improper; rather, the FMC may have "auto-tuned" the wrong frequency. The foundation for the Defendant's suggestion is unclear. In addition, the Defendant's suggestion that the ATC "interrupted" the tuning of the frequency for Tulua is not consistent with the record, which reflects that 116.7 was tuned several seconds before the ATC asked Flight 965 to identify its distance from Cali.

can suggests that Tafuri "realized" that a right turn was needed to "shallow out the intercept angle," *id.* at 48, it does not identify the reason for this speculation, or explain why the same indicators that would have told him to "shallow out the intercept" would not also have made clear the degree to which the aircraft had veered off course or the extent to which the aircraft had banked to the left.

There is an even more glaring weakness in American's position, though. At 21:39:16, seconds after the aircraft began its turn to the right and just before Tafuri dialed 117.7, Tafuri told Williams that Tulua should be "on your map." The First Officer, looking at his EHSI screen in map mode, responds "Yeah that's a left uh, left turn to [Tulua]"—understandably, since Flight 965 is now sufficiently far south and east of Tulua that the aircraft would have to turn left in order to go back to that waypoint. The subsequent exchange between the pilots makes clear that Williams, if not Tafuri as well from across the cockpit, can see that to reach Tulua, the aircraft must turn to the left, not the right; so at 21:39:31, Williams specifically asks Tafuri "[l]eft turn, so you wanna left turn *back around* to ULQ?" (emphasis added). consequently, it is implausible to suggest that, when the D Bar dropped off Tafuri's EHSI screen in VOR mode, the pilots still had a reasonable basis to believe that the aircraft was on course; if anything, the EHSI map would have confirmed what other, less sophisticated instruments were telling the pilots in no uncertain terms: wherever the aircraft was, from that point forward, it most assuredly was *not* on the airway. Notably, the PSC has suggested, and the Defendants have not disputed, that the compass heading is indicated at the top of the EHSI screen in map mode, so the pilots, if in fact they were relying on the computer-generated map, could not but have been aware of just how sharp a turn the aircraft had taken.

The charts themselves must have told the pilots a great deal about how far off the airway they were. American concedes that there came a point when the pilots apprehended that they were south of Tulua. Tr. of August 25th Hrg., at 52, 83. Specifically, the Defendant acknowledges that by 21:40:01,

when Tafuri reported that the aircraft was still 38 miles north of Cali, the pilots realized that they had missed Tulua. This view is extremely generous, since as early as 21:39:31 Williams asked Tafuri, after looking at his EHSI screen in map mode, whether the captain wanted a left turn "back around" to Tulua. In any event, it is beyond question that the pilots knew not just that Tulua was some distance to the north, but that Flight 965 had never passed over or reported from the VOR (after all, at 21:40:40—40 seconds prior to the collision—Tafuri was *still* attempting to locate Tulua). Nevertheless, American suggests that even at this time, it was not obvious that the flight was off course. The charts made altogether clear, though, that an aircraft attempting to navigate a landing at the Cali airport along the arrival and approach path prescribed for Flight 965 could *not* have bypassed Tulua to the north and still been in compliance with the published route. Accordingly, since the charts were open and available to the pilots, they had absolutely no basis to think that the flight was on course. When asked to explain his apparent view to the contrary, the most American's counsel could do was argue that "the course is there whether we are there or not" and suggest that, were it not for the "R/Rozo anomaly," the aircraft would have been "almost directly" over the course. Tr. of August 25th Hrg., at 84–85.

The final, and perhaps most striking, piece of information that plainly must have alerted the pilots that Flight 965 was off the published route was revealed by the DME indicators. Recall that, at 21:34:57, several minutes before entry of the "R," the pilots advised the ATC that the DME from the aircraft to the Cali VOR was 63. The next report is made at 21:38:46, approximately one minute after the start of the left turn, with the compass heading down to 130°. According to the pilots, the DME at this point was 38. During the ensuing one minute and fourteen seconds, the pilots discontinued the left turn and commenced a turn back to the right while traveling at an air speed in excess of 250 knots. But at 21:40:01, the pilots again reported the flight to be 38 miles north of Cali. In other words, the aircraft had drawn no closer to the Cali

VOR. It was obvious at this point, if not much earlier, that Flight 965—whatever its position in the sky—was not following the published arrival and approach path, since it seems patently impossible to be traveling on the published route, at this stage, at a speed in excess of 250 knots, and not a move single mile closer to Cali. And if there was any doubt about the pilots' ability to grasp the implications of the information they presumably monitored throughout the flight, and specifically reported at 21:40:01, twenty seconds later, at 21:40:21, Tafuri commented that the DME was down to 37. Given the fact that the aircraft had just traveled a mile closer to the Cali VOR over a twenty-second span, it was altogether more obvious that the aircraft's failure to move a single mile closer during the prior one minute, fourteen second span meant that Flight 965 had been flying off the published route for a significant period of time.

In short, given the substantial number of clues indicating that Flight 965 was off course and well to the east of the airway, there is simply nothing for a jury to decide on the issue of objective recklessness. On this record, no reasonable juror could conclude that the pilots did not commit prolonged and extreme violations of multiple standards of care in the face of plain and obvious dangers associated with landing amid rugged mountainous terrain at the Cali airport. The flight plan, the charts examined by the pilots, the EHSI map and the instruments in the cockpit made it altogether *obvious* that, once the left turn began, the aircraft was no longer on the published route, and had not yet rejoined the route for the duration of the flight. The plane's continued descent under these circumstances, at night, amid high terrain that the pilots knew posed potentially grave danger to incoming aircraft that drifted out of the valley, was reckless as a matter of law. Even if we were to assume that the D Bar function gave one of the pilots a plausible foundation to believe, for a period of time, that the aircraft was somehow on course despite its sharp turn to the left (an assumption that simply cannot be sustained on this record), Captain Tafuri's express acknowledgment of the fact that the plane had traveled not one mile closer to Cali over a

one minute, fourteen second span, coupled with all of the other clues in the cockpit, must have made plain that the flight had deviated substantially from the airway and the published route. American argues that the tremendous significance of this and other information never fully dawned on the pilots. It is for precisely this kind of circumstance, however, that the law of the Eleventh Circuit permits a finding of recklessness even without conclusive evidence that the actors understood the wrongfulness of their conduct.

## B.

Our ruling, however, does not turn solely on the objective recklessness of the pilots. No reasonable juror, even drawing all inferences in favor of the Defendant, could accept the proposition that the pilots never apprehended that the aircraft was profoundly off course while they knowingly and intentionally elected to continue the descent. As a result, the Plaintiffs unquestionably must prevail, since the pilots were trained to know, and the charts reminded them, that continuing to descend from a significantly off course position in mountainous terrain during an approach to a Latin American airport like Cali might well result in a collision with terrain. *See, e.g.*, PSC Mot., exh. 25, McFall dep., at 799–800 (acknowledging that the flight crew was "supposed to know from familiarizing itself with the terrain in the vicinity of Cali that if they turned left from a basically southerly heading down the valley that they would then be pointed at the mountains"); *id.*, exh. 8, at 77–79. The Defendant has never argued otherwise; indeed, at oral argument American's counsel squarely acknowledged that, under the circumstances of this case, a finding of subjective recklessness (which is tantamount to the first *Butler* theory of willful misconduct) would be appropriate if the pilots continued to descend from a position they knew was off the published route:

Court: Assume for the purpose of the question . . . that the pilots came to realize at some point that they were off course and, nevertheless, knowingly continued to descend[,] is there any basis on which a reasonable juror could say that such con-

duct at night in known mountainous terrain was not a violation of American policy and was anything other than reckless? . . .

Counsel: No, Judge. I mean, I think it goes without saying. If the crew knew that they were off course and lost and they were in mountainous terrain and it was nighttime and they didn't know where the airplane was and they didn't think it was safe—

Court: I didn't ask you that. . . . We can keep adding facts and adverbs and embellishing it, but let me just focus just so I understand clearly what American's position is. Assume, one, for the purpose of my question, that there came a point in time when the only way to read this transcript is that the pilots came to realize that they were off course. Assume, two, that they continued to descend, because there is no question that they continued to descend until the warning of the terrain comes up. Is there any basis on which a reasonable juror could say that such conduct flying into Cali at night in known mountainous terrain was anything other than reckless? How could they reach that conclusion?

Counsel: Well, I think it would be a degree of being off course, but if the jury wants to believe and come to the conclusion that we knew *we were off course, significantly off course, knew that that was the fact and then we continued to descend. I don't know they would have any other choice.*

Tr. of August 25th Hrg., at 63–64 (emphasis added) American's witnesses testified similarly. Al Madar, the defendant's "Manager of Flight Standardization" and one of the coordinators of its in-house investigation of the crash, offered the following observations:

Madar: Let me make the statement that I've made before. A pilot who intentionally descends into—below an altitude that takes him below known terrain when he does not know where he is, that would be wrong, one hundred percent. *He should know where he is before he descends and know where the terrain is before he descends.*

Counsel: Correct? It's a deliberate, willful, conscious decision to do something, right?

Madar: It seems to be a fair characterization. I mean if assuming that the person is in full control of his faculties and other assumptions of such, then I would assume that if he knew all those things, that it's a willful act that may be inappropriate, based on the circumstances you've set forth.

PSC Mot., exh. 26, at 304–05 (emphasis added). Barry Trudeau, the defendant's chief technical pilot, when asked during his deposition whether "if you don't know where you are and you know there are mountains in the area and you consciously decide to continue a descent, you would characterize that decision as *suicidal*?", answered "That's right." PSC Mot., exh. 30, at 303–304 (emphasis added). These admissions do nothing more than acknowledge the importance of the "objective" standard of care embedded in American Airlines' training: "Do not descend unless you know exactly where you are and the safe minimum altitude" and "[w]hen operating on an unpublished route . . . [you] shall maintain the last altitude assigned until the aircraft is established on a segment of the published route." *See supra*, at 10–16, 53–54.

Our analysis of the pilots' state of mind necessarily must draw on the CVR and the reasonable inferences that can be made based on the pilots' remarks.[21] Nevertheless, although the transcript does not reflect this fact, American concedes that there *did* come a point when the pilots apprehended that the aircraft was headed in the wrong direction. As the Defendant sees it, this

---

**21.** As noted above, the Defendants' most recent transcript reflects, at several points, changes in language that lend more support to American's view that the pilots never realized they were off course. For example, a remark by Williams at 21:38:49 is altered from "Uh where are we" to "Uh, were we," a change that is not easy to square with the words recorded on the tape (which the Court has reviewed in chambers and in the presence of counsel). Similarly, another remark by Williams at 21:38:58 is altered from "yeah, where we headed" to "Yeah, where are we headed now." Nevertheless, for purposes of this Order, we will accept American's twist on what the pilots said, since even using the McDermott transcript it is no less plain that, at some point during the descent, the pilots realized they were off the published route.

point did not occur until approximately 21:39:05, when Tafuri first advised Williams to "come to the right a little bit." [22] This instruction, says American, prompted a fairly immediate correction of the problem (the right turn was initiated some seven seconds later) after which the pilots believed they had "reconciled conflicting information" and were back on course in the valley. The Defendant acknowledges that the pilots were at least negligent in failing to perceive the left turn for as long as they did, but insists that the CVR contains no evidence that the pilots actually perceived the turn until a great deal of the damage had been done.

It is extremely difficult to accept the notion that, for a span of, at the very least, a minute and twenty seconds, with the aircraft's heading dropping rapidly from 193° to 111°, pilots with the skill and experience of Tafuri and Williams continued to believe they were tracking the published route to Tulua. But let us assume, for present purposes, that American is correct in its suggestion that a reasonable jury could infer (1) the pilots truly did not perceive the turn for a significant

period of time, (2) even when they perceived that the aircraft was headed in the wrong direction, they didn't believe the aircraft was far off course, because they didn't know how long the aircraft had been turning, and (3) once it became clear that the heading was wrong, the pilots acted promptly and believed they had put themselves back on course. The most powerful evidence that the pilots knew they were off course, and yet continued to descend, is the conversation that unfolds *after* the turn back to the west is initiated. The critical excerpts from American's second CVR transcript appear below, starting shortly after Captain Tafuri's initial, unsuccessful attempt to dial the frequency for Tulua. Keep in mind that American does not dispute that, by 21:40:01, if not substantially earlier, the pilots knew that the aircraft was south of Tulua and also knew that the aircraft had not reported passing over that waypoint.

21:38:54

Tafuri Let's go right O uh, Tulua first of all, okay?

> Ewell: Yes.
> Counsel: *And there is nothing in the approach to Runway One Nine that would call for a heading of 120 degrees?*
> Ewell: *Correct,*
> Counsel: So we know that they know that?
> Ewell: Yes.
> Counsel: Would you assume or would you opine, Captain Ewell, that they know they are descending?
> Ewell: Yes. . . .
> Counsel: Now, you would agree with me, Captain, that in order to have good positional awareness, situational awareness, the crew would either have to know for how long they had been traveling to the left or would have to reestablish their position using instruments in the cockpit?
> Ewell: In order to have situational awareness?
> Counsel: Yes, sir.
> Ewell: I believe so.
> Counsel: Is it fair to say that as of this point in time that we have just been looking at, 21:38:54 to 21:39:05—are you with me so far?
> Ewell: Yes.
> Counsel:—that the flight crew *did not know their exact position vis-a-vis the airway because they didn't know how long they had been flying off it?*
> Ewell: *I agree with that.*
> Ewell dep., at pp. 586–87, 90–91 (emphasis added).

22. Of course, as noted above, American never explains quite how Tafuri came to believe that a right turn was necessary without also noticing, by reference to the charts, the compass headings and other objective data, just how far in the wrong direction the aircraft was pointed and for how long it had been traveling to the east. After all, when Tafuri said "come to the right a little bit," the compass heading was 111° and still dropping, and the roll was 18°.

That being said, there is no room to dispute that the pilots did realize they were going the wrong way. For example, during his deposition, American's chief pilot, Cecil Ewell, made the following concessions:
> Counsel: Okay. Now, let's talk about what they do know as of 21:38:54, roughly, when the captain says, "LET'S GO RIGHT TO TULUA FIRST OF ALL," they know at approximately that point in time that their heading is somewhere between 122 and 110 degrees depending upon when exactly in that short time frame they pick up the turn?
> Ewell: Yes, sir.
> Counsel: They know that that heading is incorrect? I think you would have to assume that because they have looked at the approach plate, they see that there is nothing like a 120–degree heading on it because they had that out before and you would assume that they know generally that the valley is oriented north/south with the mountains on the east and the west?

21:38:58

Williams Yeah, *where are we headed now?*

21:38:58

Tafuri Seventeen seven, ULQ uh, I don't know, what's this ULQ, *what hap, what happened here?*

21:39:04

Williams Manual heat

21:39:05

Tafuri Let's come to the right a little bit

21:39:06 ·

Williams Yeah, *he's wanting to know where we're headed*

21:39:07

Tafuri ULQ, I'm gonna give you direct Tulua

21:39:10

Williams Okay

21:39:10

Tafuri Right now

21:39:11

Tafuri Okay you got it?

21:39:13

Williams Okay

21:39:14

Tafuri And

21:39:18

Tafuri It's on your map, should be

21:39:19

Williams Yeah that's a left uh, left turn to ULQ

21:39:22

Tafuri Yeah, *I gotta identify that fucker though,* I

21:39:25

Tafuri Okay I'm getting it, seventeen seven, *it just doesn't look right on mine I don't know why*

21:39:30

Williams Left turn, so you wanna left turn back around to ULQ?

21:39:32

Tafuri No

21:39:33

Tafuri Hell no, let's press on to

21:39:35

Williams Well we're

21:39:36

Williams *Press on to where though*

21:39:37

Tafuri Tulua

21:39:39

Williams That's a right, no that

21:39:40

Tafuri *Where're we going,* one (twe) [partial word], come to the right, let's go to Cali first of all, let's, *we got fucked up here didn't we?*

21:39:45

Williams *Yeah*

21:39:46

Tafuri Go direct CLO

21:39:47

Williams Okay, oh

21:39:51

Tafuri *How did we get fucked up here?*

21:39:54

Tafuri Come to the right, right now, come to the right right now

21:39:55

Williams Yeah, we're, we're in a heading select to the right

21:39:58

Tafuri And

21:40:01

Tafuri And American uh, we're thirty-eight miles north of Cali and you want us to go to Tulua and then do the Rozo uh, to the uh Runway right, One One, One Nine?

21:40:11

ATC Kay the RO, you, you can land it, Runway One Niner, you can use Runway One Niner, what is your altitude and the DME from Cali?

21:40:21

Tafuri Okay, we're thirty-seven DME at ten thousand feet

21:40:24

Tafuri You're okay, you're in good shape now . . .

21:40:26

Tafuri We're headin', headin' the right direction, you wanna

21:40:27

ATC Report at five thousand on a final to One One, Runway One Niner

21:40:29

Tafuri *Oh shit, you wanna take the One Nine yet?*

21:40:34

Tafuri Come to the right, come, come right to Ca, Cali for now, kay?

21:40:34

Williams Uh, yeah

21:40:37

Williams Okay

21:40:40

Tafuri *It's that fuckin' Tulua I'm not getting for some reason*

21:40:44

Tafuri *See I can't get, okay now, no. Tulua's fucked up*

21:40:48

Williams Okay, yeah

21:40:49

Tafuri But I can put it in the box if you want it

21:40:52

Williams No, I, I don't want Tulua, let's just go to the extended centerline of uh

21:40:55

Tafuri Which is Rozo

21:40:56

Williams Rozo

21:40:56

Tafuri Why don't you just go direct to Rozo then, alright, I'm gonna put that over ya . . .

(emphasis added). The undeniable conclusion left by this dialogue is that while the pilots may well have believed they could locate and intercept the published route, they also recognized that they were not yet on that route. No reasonable juror, when confronted with Williams' query of "[p]ress on to where though" in response to Tafuri's instruction to "press on," or Tafuri's observation "[w]here're we going . . . we got fucked up here didn't we?"—followed by Williams'

rejoinder "Yeah"—or other similar statements, could come away with the idea that the pilots genuinely believed they were established on the published route. Moreover, if indeed the pilots believed they were on the published route, many of their comments seem curious indeed. For example, during a two minute span near the end of the flight, Tafuri suggested that the aircraft fly direct to Tulua (21:39:07), then suggested that the aircraft fly direct to the Cali VOR (21:39:46) and later suggested that the plane fly direct to Rozo (21:40:56). Not only are these waypoints critical guideposts on the Rozo 1 STAR and VOR DME Rny 19 approach that the pilots unquestionably knew had not been touched, Captain Tafuri's shifting instructions are wholly incompatible with the Defendant's speculation that he genuinely believed Flight 965 was following the published route to the airport.

The CVR transcript not only makes clear that the pilots realized they were off the published route, but also indicates that he pilots did not even know precisely where they were in the sky.[23] American has conceded that Tafuri and Williams were expected to be aware of the true position of the aircraft with respect to the published approach route and, more specifically, the airport, the Tulua VOR and the Rozo NDB. *See* PTS, § V at ¶¶ 53–54. In addition, the pilots were required to "be aware of the actual position of the aircraft relative to the highest terrain obstacle in the area." *Id.* at ¶ 49. The CVR provides little, if any, support for the view that the pilots discharged these basic navigational duties.

American's response to these issues is not convincing. First, it suggests that comments like "where are we headed now" (21:38:58) may reflect nothing more than an attempt to clarify the heading of the aircraft. But the aircraft's heading, as noted above, is made absolutely plain on multiple instruments in the cockpit. Second, the Defendant suggests that comments like "[w]here're we going . . . we got fucked up here didn't we?" . . . "Yeah," simply are part of the process of

---

**23.** Noe, in fact, has testified that as early as 21:37:29, when the pilots sought permission to go "direct to [Tulua, according to American]—

despite actually being adjacent to Tulua—Captain Tafuri "doesn't know exactly where he is in the sky." PSC Mot., exh. 21, at 152.

*reconciling conflicting information.* Even leaving aside the Defendant's failure to articulate quite what this suggestion implies, American never identifies the information that, at this particular point in time, might have led the pilots to believe the plane was actually on course. Third, the Defendant highlights Tafuri's comment at 21:40:24: "You're okay, you're in good shape now." Arguably this remark can be read as an indication that Tafuri, at least, believed the plane was on or very near the published route. But given the Captain's other comments, as well as his subsequent unsuccessful attempt to locate Tulua (which he knew now to be significantly to the north of the aircraft), it is far more likely that Tafuri was doing nothing more than encouraging his copilot, or urging him to follow a path that eventually would lead the aircraft to the published route. In any event, while certain inferences may seem more plausible when the pilots' remarks are taken in isolation, read as a whole, against the backdrop of all of the objective evidence telling the pilots how off course they were, it strains credulity too far to say (and American says just this) that never, not even for a moment, did the pilots doubt they were adhering to the route they were assigned to follow.

American places a great deal of emphasis on the supposition that the pilots genuinely believed they were cleared to 5000 feet by the ATC's instruction to "report Tulua on uh, twenty-one uh, miles uh, five thousand feet" at 21:37:46. The record may well be susceptible to this inference—at 21:38:01, Tafuri answered "That's right" when asked by Williams "Okay, so we're cleared down to five now?"—but we find it of little moment. As American concedes, the possibility that the pilots believed they had been cleared to descend as low as 5000 feet would not make the pilots' continued descent any less reckless if there came a point where the pilots knew that Flight 965 was off course:

> Court: So *even if the ATC had clearly told them they could descend to 5,000 feet, and if they took it that way,* the conduct would still be reckless if they knew they were off course and they continued to descend at night into the Cali region.

Counsel: *Yes.*

Tr. of August 25th Hrg., at 65 (emphasis added). Even without this plain concession, no reasonable juror could accept the proposition, based on the materials in this record, that even if the pilots knew they were off course to the south of Tulua and east of the airway, knew they were in an area of critical terrain and knew it was night, they nevertheless might have genuinely believed that their continued descent was not likely to result in harm because they thought the ATC had given them permission to descend to 5000 feet after they sought approval for going "direct to Rozo."

American also emphasizes the undisputed fact that the pilots never informed the ATC that Flight 965 was lost or off course. Nor did the pilots ever declare an emergency, which American Airlines policy requires in certain situations when a pilot is aware of being lost. *See* PTS § V ¶¶ 77, 78. But these facts do not lend a great deal of support to the Defendant's position. There may be any number of reasons why the pilots, even if they believed they were off course, did not declare an emergency or seek the assistance of the ATC (especially if they knew that the ATC at Cali could not track them on radar). Perhaps the most plausible explanation is that pilots always believed they could solve any navigational problem on their own. But it is the very essence of recklessness to persist in attempting to navigate your way through a potentially dangerous situation when you know the safest, and indeed mandatory, step is to retreat. The critical, and ultimately fatal, error by the pilots of Flight 965 was their deliberate decision to continue to descend as they undertook the task of restoring the aircraft to the published route. And the test for subjective recklessness does *not* require proof that the pilots intended to kill themselves or the passengers; it simply requires a showing that the pilots recognized that their intentional acts created a significant risk of harm.

## C.

To summarize, no reasonable juror, presented with the record before this Court, could find that the pilots' decision to continue

the aircraft's descent despite being significantly off course, at night, in an area known for dangerous terrain, did not constitute the intentional performance of an act "'with knowledge that the ... act will probably result in injury or damage'" or an act performed in "'reckless disregard of the consequences,'" as we construe that phrase. The facts and inferences suggested by the Defendant simply lack the measure of persuasiveness that might permit a jury to enter a verdict for American Airlines, at least with respect to this crucial issue. As a result, the Plaintiffs are entitled to a determination that the pilots of Flight 965 demonstrated "willful misconduct" as that standard has been interpreted by the binding precedent of this Circuit.

In reaching this conclusion, we do not mean to suggest that there are no other acts that might support the entry of judgment as a matter of law on willful misconduct. First, as noted above, it is an extremely close question whether this record contains evidence of the kind of quality and persuasiveness that might permit a reasonable jury to accept American's explanation of why the pilots sought to take Flight 965 "direct to Rozo." [24] Second, the pilots' failure to verify that "R" was in fact the identifier for the Rozo NDB was concededly negligent and at least arguably reckless. American Airlines training specifically requires that, before a waypoint is executed into the FMC, it must be discussed among the pilots. *See, e.g.,* PSC Mot., exh. 25, McFall dep., at 683–84, 806–08. The Defendant asserts that since the twelve

"R"'s that appeared on the CDU screen are listed in order of proximity to the aircraft, and the second "R" was not in the Northern Hemisphere, it was understandable why one of the pilots simply executed the first "R". But if the pilots had discussed or attempted to verify what they were doing, and investigated various clues, including the difference between the latitude and longitude of the Rozo NDB (as reflected on the charts) and the latitude and longitude for the initial "R" (as it appeared on the CDU screen), they would have realized that "R" was not the correct identifier.

Third, it is difficult to accept the Defendant's argument that the pilots did not act recklessly by, in the final two minutes of the flight, abandoning their effort to fly to Tulua without obtaining clearance to do so from the ATC. FAR § 91.193 states that "[w]hen an ATC clearance has been obtained, a pilot in command may not deviate from that clearance, except in an emergency, unless that pilot obtains an amended clearance." In addition, "[e]xcept in an emergency, no person may operate an aircraft contrary to an ATC instruction in an area in which air traffic control is exercised." PSC Mot., exh. 27. The PSC contends that, once the pilots realized they had missed Tulua, and observed that the aircraft had traveled so far to the southeast that Tulua was actually a left turn, Tafuri, at least, made the decision to turn right and simply skip Tulua, as evidenced by the instructions "Let's go to Cali first of all" (21:39:42) and "go direct CLO" (21:39:46). American's rejoinder to this point, other than

---

24. The Defendant asserts that, even assuming the pilots really did intend to bypass Tulua and fly direct to Rozo, a reasonable jury could find that this decision does not rise to the level of recklessness, because the difference between the two routes was relatively small, the valley was wide enough to accommodate the alternative path and the likely time savings was minimal. This argument is not entirely convincing. As the PSC emphasizes, due to the hazardous terrain in Latin America, pilots flying into Latin American airports like Cali are instructed not to deviate from the applicable published STAR except under certain circumstances not applicable here. Indeed, the printed flight plan for Flight 965 contains the express warning: "CRITICAL TERRAIN EXISTS DURING THE DESCENT. STRICT ADHERENCE TO THE STAR NECESSARY FOR TERRAIN CLEARANCE." PSC

Mot., exh. 4. The Pilot Reference Guide similarly states that pilots should accept an abbreviated procedure only if, among other things, "the sun is shining," which it was not at 21:37:28 on the night of December 20, 1995. The importance of adhering to the STAR in mountainous terrain is not just to ensure that the aircraft maintains a "horizontal" margin of safety, but also to ensure that the aircraft has sufficient "vertical" clearance to avoid a collision during the descent. In this instance, the slight bump to Tulua before rejoining the 193° radial is designed to keep incoming aircraft in the center of the valley as they navigate two tall peaks. For this reason, if indeed the pilots intended to abbreviate the STAR by going direct to Rozo, the danger of this maneuver should have been plain, and the deviation from American Airlines' policy far more than "de minimis."

its suggestion that the pilots were simply trying to ensure they were fully aligned with the 193° radial, is that the ATC did subsequently give the pilots permission to bypass Tulua, when he answered Tafuri's question at 21:40:01—"you want us to go to Tulua and then do the Rozo uh, to the uh Runway right, One One, One Nine?" with the response "Kay the RO, you, you can land it, Runway One Niner, you can use Runway One Niner.... Report at five thousand on a final to One One, Runway One Niner." We think it unlikely that a reasonable jury could construe this exchange as relieving Flight 965 of its obligation to pass over Tulua, or conclude that the continued right turn was merely negligent as opposed to reckless given the aircraft's location at the time. To begin with, the pilots did *not* ask for permission to bypass Tulua; rather, they asked whether the ATC wanted Flight 965 to go to Tulua and "do the Rozo" arrival before approaching to Runway 19. Similarly, the ATC, in response, did not give Flight 965 permission to bypass Tulua; even if we construe "Key the RO" as something other than an affirmation of precisely what the pilots asked—"you want us to go to Tulua and then do the Rozo uh, to the [Runway 19]?—the ATC simply reminded the pilots that they could land the aircraft on Runway 19 and were obliged to report at 5000 feet. Nor did the ATC "forgive" the pilots' failure to report at Tulua, especially since (contrary to American's suggestion), the pilots never expressly informed the ATC that Flight 965 was then south of Tulua.

We go through this brief summary of the pilots' other errors simply to underscore that there are multiple acts that arguably might support the entry of summary judgment on the question of willful misconduct. In a different case, under different circumstances, summary judgment might be appropriate on the basis of any of these acts. Indeed, there is case law suggesting that a finding of willful misconduct may be premised on the aggregation of a series of improper acts, even if none of the acts, standing alone, seems reckless. *See, e.g., In re Air Crash Disaster. Polec v. Northwest Airlines, Inc.,* 86 F.3d 498, 545 (6th Cir.1996) (citing *Butler* and *Tuller* and noting that "[n]o principle of law or logic requires a jury evaluating willful misconduct

to focus exclusively on discrete acts, without regard for the complete chain of events leading to the accident ... [e]specially ... if those acts, though individual, nevertheless reflect an overall frame of mind or course of conduct which led to them"). We emphasize, however, that our ruling does not turn on an aggregation of merely negligent acts. Nor does it turn on any abiding sense that errors of the frequency and magnitude apparent from this record must, when viewed in their entirety, demonstrate willful misconduct. In evaluating the PSC's motion, we have looked with an especially forgiving eye at the stream of inferences suggested by American Airlines, and have searched carefully for any fair, honest and plausible grounds to allow this litigation to proceed to a jury trial. As a result, it may be that we have been generous to the Defendant with respect to some of the pilots' errors. But one of these grievous errors—their continued descent from a position that was radically off course at night in an environment where the risk from high terrain was palpable and profound—was so plainly reckless, so dangerous, so extreme a violation of the standard of care and so directly responsible for the collision with the mountain—that even allowing the Defendant every benefit of the doubt, the law requires that summary judgment be entered for the Plaintiffs on this basis alone.

### D.

Before closing this portion of our analysis, we note the Defendants' reliance on *Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532 (2nd Cir.1965), *cert. denied,* 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966), a case arising out of the Second Circuit. While at first blush there are some parallels between that case and the litigation before us, the Second Circuit's opinion is distinguishable on legal and factual grounds. *Berner* concerned an airplane that crashed into a mountain near San Francisco while attempting to land. The plaintiff sought to hold the carrier responsible for willful misconduct within the meaning of the Warsaw Convention, arguing that the pilot commenced the landing without receiving the proper signals. A jury returned a verdict for

the carrier, but the district court subsequently entered a judgment n.o.v., finding the carrier liable for willful misconduct and ordering a new trial on damages. The court of appeals reversed this ruling. Initially, the panel observed that the district court erred by applying a definition of willful misconduct that did not require proof that the actor realized that damage was likely to result from his conduct—a requirement under the law of the Second Circuit. *Id.* 536–37. The panel then explained that it was far from clear whether the pilot's attempt to land the plane without having obtained the proper clearance was done with an understanding that harm was likely to result. According to the court, the defendant had presented sufficient evidence to support the jury's apparent conclusion that the pilot truly believed he was in the proper location to commence the landing. Although there was evidence to support the plaintiffs's view that the pilots must have recognized that they did not receive the proper signals, and therefore should not have attempted the landing, this evidence was not sufficiently unequivocal, rendering the district court's order nothing more than a substitution of its judgment for that of the factfinder. *Id.* at 538.

There are three critical distinctions between *Berner* and the case at bar. First, this Court is bound to follow the definition of "willful misconduct" adopted by the Eleventh Circuit in *Butler*, not the definition applied in the Second Circuit or elsewhere. As noted above, under *Butler*, a plaintiff may establish willful misconduct by proving that the defendant's employees acted with "reckless disregard for the consequences," a standard that can, but need not, be established by a showing that the employees committed an extreme deviation from the standard of care under circumstances where the danger was plain and obvious for all to see. Second, while in *Berner* it was unclear whether the pilot's conduct even constituted negligence, *id.* at 538, here there can be no genuine dispute the pilots of Flight 965 committed multiple breaches of the standards of care in the face of myriad clues that made altogether obvious the danger of their acts. Moreover, while in *Berner* there was evidence suggesting that radio communication trouble may

have interfered with the transmission of the necessary signals, *id.*, here there is no argument that the raw data navigational instruments in the cockpit, or the charts consulted by the pilots, gave them an incorrect portrait of their location after they veered off the published approach. Third, in the case at bar the undisputed facts, especially the CVR transcript, make plain that no reasonable juror could find that the pilots did not apprehend that they were off course as they continued their descent into the mountainous terrain surrounding the Cali airport. For all of the foregoing reasons, *Berner* does not in any way require the submission of the PSC's claims to a jury.

## VI.

Having concluded that no reasonable juror could disagree that American Airlines is responsible for willful misconduct, as that term is defined in *Butler*, we turn to the related issue of causation. The Defendant essentially asserts that a reasonable juror could conclude that the misconduct of third parties, specifically Jeppesen, Honeywell or the Colombian air traffic controllers, constituted the sole proximate causes of the crash, thereby relieving American of any responsibility for its misconduct. This argument, we conclude, reflects a basic misunderstanding of the concept of proximate cause.

■ For the Convention's limitation of liability provision to be lifted, a plaintiff must show that the acts of willful misconduct caused his alleged injuries. *See, e.g., Johnson v. American Airlines, Inc.,* 834 F.2d 721, 724 (9th Cir.1987). Although there is relatively little case law discussing the operation of causation principles in Warsaw Convention cases, these principles are fairly well settled in other areas of tort law. As American acknowledges, an inquiry into causation requires a two-step analysis. First, the court must determine if the act was the actual, or "but for," cause of the injury. The Defendant does not contest, and indeed has acknowledged, that the allegedly wrongful acts identified by the Plaintiffs were among the actual causes of the crash. *See, e.g.,* Tr. of August 19th Hrg., 1997, at 31–34; Tr. of

August 25th Hrg., at 74–75. Even without this concession, no reasonable juror could not find "but for" causation. If the aircraft had not descended from approximately 17,000 feet above MSL to under 8500 feet above MSL during the four minutes that elapsed after it veered off course into mountainous terrain to the south and east of Tulua, the collision near the summit of El Deluvio, a mountain peak situated well northeast of the airport, at an altitude of 8900 feet, would not have occurred.

 Second, the court must ask if the act was the proximate, or "legal," cause of the injury. *See, e.g., Perera Co., Inc. v. Varig Brazilian Airlines, Inc.,* 775 F.2d 21, 23 (2nd Cir.1985). A proximate cause is often described as one that " 'in natural and continued sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.' " *Sosa v. Coleman,* 646 F.2d 991, 993 (5th Cir. Unit B 1981) (citation omitted). An action need not be the sole cause of the plaintiff's injury to qualify as a proximate cause; rather, "[i]t need only be a substantial factor in producing the injury if the injury was reasonably foreseeable at the time of the wrongful act." *Cheng v. United Airlines, Inc.,* 1995 WL 42157 at *3 (N.D.Ill.1995).[25] As this comment suggests, proximate cause is "defined in terms of foreseeability." *Sosa,* 646 F.2d at 993. In other words, a "negligent act is not the proximate cause of a loss that results from the intervention of a new and independent cause that is not reasonably foreseeable. However, where the intervening act is probable or foreseeable, [the] causal connection is not broken." *Id.* (citations omitted).

American first insists that questions of proximate cause are always reserved for a jury, and cannot be resolved on summary judgment. As a general rule, proximate cause is an issue that typically may not be susceptible to determination as a matter of law. But courts have recognized that this issue, like all others, may be appropriate for resolution at the summary judgment stage if a reasonable juror could reach only one conclusion. As a district court observed in connection with a Warsaw Convention claim, while "[q]uestions of proximate cause are ordinarily treated as questions of fact," these questions can and should be decided as a matter of law if no genuine issue remains in dispute. *Margrave v. British Airways,* 643 F.Supp. 510, 513–14 (S.D.N.Y.1986) (entering summary judgment in favor of a carrier and noting that no reasonable juror could conclude that the carrier's conduct proximately caused the plaintiff's injuries).

 American next maintains that a reasonable juror could conclude that the acts of misconduct by the pilots were foreseeable to Jeppesen and Honeywell, and therefore these parties, not American Airlines, are wholly responsible for the Plaintiffs' injuries. As it has throughout the latter stages of this litigation, American attempts to shift the focus away from the conduct of its employees and toward the FMC and the database. American contends that while all of the available Jeppesen charts indicated that "R" was the proper identifier for the Rozo NDB, the Jeppesen-manufactured database linked the identifier "R" to the waypoint known as Romeo in the direction of Bogota. American asserts that Jeppesen engineers "had been aware of this design defect in their database for many years," but continually postponed taking steps to remedy the problem. The Defendant adds that Honeywell, like Jeppesen, knew about the problem of so-called duplicate identifiers, but knowingly incorporated the defective database into the FMC, failed to warn carriers like American about the problem and failed to expose Jeppesen's unwillingness to remedy the situation.

Even leaving aside the question of whether a reasonable juror could conclude that Jeppesen and Honeywell should have foreseen

---

**25.** The PSC acknowledges that the conduct of other entities "contributed" to the crash. But American's suggestion that "[t]his concession alone bars the entry of summary judgment" is both unsupported and incorrect. To begin with, the fact that conduct "contributes" to an accident does not necessarily make that conduct a proximate cause of the plaintiff's injuries. Moreover, as *Cheng* indicates, there may be more than one proximate cause of an accident. As noted below, issues concerning the relative culpability of various parties whose acts "contributed" to the demise of Flight 965 can and should be litigated separately.

that, as a result of their failure to correct or warn about the alleged defect in the database, the pilots would continue to descend into the mountains once they were off course, the Defendant's argument is fundamentally flawed. The fact that the subsequent behavior of the pilots may have been foreseeable to Jeppesen and Honeywell might preclude these entities from arguing that the pilots' conduct was an intervening, superseding cause of the crash in the event the victims attempt to hold them liable for their injuries. In *Worthington v. United States,* 21 F.3d 399 (11th Cir.1994), for example, the Eleventh Circuit concluded that any negligence on the part of an airplane pilot who crashed his aircraft while attempting to land at a fog-bound airport did not vitiate the negligence of the air traffic controllers who failed to supply accurate details regarding the prevailing weather conditions. The court explained that "[s]patial disorientation and the failure to successfully execute a missed approach are precisely the harm that this defendant should have expected after depriving [the pilot] of accurate and timely information about weather conditions when he approached a landing strip shrouded with fog." *Id.* at 406. But it certainly does not follow that American Airlines can point to the *prior* misconduct of Jeppesen and Honeywell as a basis for exonerating it from responsibility for all subsequent, foreseeable acts of willful misconduct by its employees. Indeed, *Worthington* contains absolutely no suggestion that the pilot could not have been held liable for any of his acts that breached the relevant standard of care and proximately caused the plaintiffs' injuries. We are aware of no case, in the context of the Warsaw Convention or an ordinary tort claim, that has endorsed the backwards proximate cause analysis put forward by American. As the Supreme Court explained in *Exxon Company, USA v. Sofec, Inc.,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996), the concept of superseding cause applies " 'where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a *later* cause of independent origin . . .' " (emphasis added) (citation omitted).

Perhaps recognizing its dilemma, the Defendant asserts that a jury could conclude that the degree of misconduct attributable to Jeppesen and Honeywell so outweighs any misconduct by American that it would be unjust to hold American responsible for all of the Plaintiffs' compensatory damages. The Defendant adds that while Jeppesen and Honeywell had years to correct their errors, the pilots of Flight 965 had only minutes to respond to the unexpected left turn attributable to the anomaly concerning the identifier for the Rozo NDB. This theory fails on several levels, though. First, we are aware of no case substituting what amounts to a search for the single entity most responsible for an accident for the foreseeability analysis required by the jurisprudence of proximate cause. American relies principally on comments by the Eleventh Circuit in *Worthington,* where the panel quoted the following language from a ruling by a Florida intermediate appellate court:

> Florida courts, in accord with courts throughout the country, have for good reason been most reluctant to attach tort liability for results which, although caused-in-fact by the defendant's negligent act or omission, seem to the judicial mind highly unusual, extraordinary, bizarre, or stated differently, seem beyond the scope of any fair assessment of the danger created by the defendant's negligence. Plainly, the courts here have found no proximate cause in such cases based solely on fairness and policy considerations, rather than actual causation grounds.

21 F.3d at 405 (citation omitted). Notwithstanding the potential sweep of this passage, *Worthington* itself recognizes that the proximate cause inquiry is more channeled than a freewheeling attempt to allocate liability among prior and subsequent tortfeasors based on amorphous notions of "fairness and policy." Indeed, the Florida case cited by the panel simply held that a subsequent tortfeasor's acts were " 'so far beyond the realm of foreseeability that' " no liability could be imposed on the earlier tortfeasor. *Id.* Familiar tort law concepts of contribution, comparative fault and apportionment may provide the Defendant with a vehicle to litigate the relative culpability of Jeppesen, Honeywell

and other entities. But if the misconduct attributable to American Airlines was a substantial factor in bringing about the demise of Flight 965, and the aircraft's eventual fate was neither bizarre nor unforeseeable, then the possibility that the prior acts of other entities contributed to the accident is of no moment, even if those entities seem more blameworthy than the single Defendant the Plaintiffs have chosen to sue.

 Nor are we persuaded that any wrongful acts by the Colombian ATC's make the conduct of the pilots any less a "substantial factor" in causing the Plaintiffs' injuries. The Defendant asserts that the ATC's made a series of errors that proximately caused the crash. American specifically alleges the following misconduct: (1) the failure of the ATC at Bogota to inform the ATC at Cali that the aircraft was flying on a direct clearance to the Tulua VOR; (2) the Cali ATC's "haphazard use of terminology"; (3) the Cali ATC's failure to make absolutely clear that Flight 965 was supposed to fly to Tulua not Rozo; (4) the Cali ATC's "repeated[ ] diver[sion] by personal (non-ATC) business"; and (5) the Cali ATC's failure to recognize the significance of the cockpit's report that the aircraft had traveled only one mile closer to the Cali VOR over an almost two-minute span. Def. Resp., at 86–89. As a result of these alleged errors, American maintains, the Cali controllers did not recognize that Flight 965 was off course, and took inadequate measures to ensure the safe landing of the aircraft. As one of the Defendant's experts put it, "[i]n my opinion had the controller been paying full attention to his duties, he would have noticed several items in the transmission from 965 that should have alerted him to react positively and prevent the accident from happening.... [There were] red flag[s] to alert him that there was something out of kilter and he should have done something to correct it." Hugonnett dep., at 21–22.

 There are significant flaws in American's position. To begin with, several of the allegedly wrongful acts highlighted by American occurred before the pilots of Flight 965 elected to continue their descent even though it was obvious that the aircraft was off course. For example, the fact that the ATC could have said "fly via Tulua" instead of "Report Tulua" when the pilots were programming the plane to fly directly to Rozo does not in any way operate to excuse the pilots' *subsequent* decision to continue their descent once they knew or plainly must have known they were off course (especially if we accept American's theory that only at the very end of the flight did the pilots deviate from their intention to pass over Tulua). Moreover, the possibility that the ATC's did not do what the pilots obviously should have done *themselves*—"verify the exact location of the aircraft"—is not, on this record, the kind of intervening act that completely breaks the causal chain and wholly cuts off the liability of American Airlines.[26] But even assuming *arguendo* that a reasonable jury could find that any acts of misconduct by the Colombian ATC's occurred subsequent to all of the misconduct attributable to American, and were of sufficient egregiousness to supplant the pilots' recklessness, the record makes abundantly clear that the perceived inadequacies of Colombian air traffic controllers were known by and altogether foreseeable to the Defendant. To reiterate, the subsequent conduct of another actor may be a superseding cause only when that conduct is not foreseeable at the time the defendant engages in its misconduct. As quoted at length above, however, Tafuri and Williams, like all American Airlines pilots flying into Latin America, were specifically instructed that "[i]f the airport is in high terrain, you are best advised to *assume the controller will become distracted and allow you to fly into a mountain.*" PSC Mot., exh. 8, at 63 (emphasis added). Consequently, pilots must *"never rely on terminal controllers to keep you from hitting mountains." Id.* (emphasis added). Pilots are expected to know that "when the controller issues a clearance for

---

**26.** There is some inconsistency in American's view that while the Cali ATC—when informed that the aircraft had moved just one mile closer to the Cali VOR despite flying at over 250 knots for close to two minutes—plainly should have been alerted that something was "out of kilter," a reasonable jury could infer that the pilots, although they expressly reported this fact to the ATC, reasonably failed to grasp its significance.

descent, it will normally be based upon the controller's assumption that you are taking charge of your own terrain separation. *The burden rests squarely upon you.*" *Id.* 78 (emphasis in original); *see also id.,* at 72 ("You should never entrust yourself to a controller in mountainous terrain in [Latin] America"); *id.,* exh. 18, Rauhofer dep., at 81–82.[27] In short, American Airlines' training materials make abundantly clear that pilots flying into airports like Cali—for reasons of language, technology and training—must be wary of relying on the assistance of local ATC's, and simply should not expect local ATC's to "correct," "prevent," or even point out, navigational errors made by the pilots. Tafuri and Williams were squarely on notice that no matter what the ATC did or did not advise them about their position in the sky, it was ultimately *their* responsibility to take all necessary steps to ensure the safe descent of the aircraft. This may well have been why the pilots made little or no effort to contact the ATC's on their own initiative during the final minutes of the flight. Accordingly, while the acts and omissions of the Colombian controllers may have contributed to the crash, they do not, for a variety of reasons, provide a reasonable jury with a lawful basis to find that any misconduct by the ATC's wholly superseded, and wholly excused, the willful misconduct of the pilots.

## VII.

■■■■■ The claims of cabin crew Plaintiffs do not implicate the Warsaw Convention. Instead, pursuant to the parties' agreement, Florida law governs these claims. The cabin crew Plaintiffs are proceeding on a theory of negligence, which in Florida requires proof of four elements: (1) a legal duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach was the proximate cause of the injury. *See, e.g., Coker v. Wal–Mart Stores. Inc.,* 642 So.2d 774, 776

(Fla. 5th Dist.Ct.App.1994), *rev. denied,* 651 So.2d 1197 (Fla.1995). No reasonable juror could find that these elements have been not been established here.

■■■■■ Under Florida law, a common carrier generally must "'exercise the highest degree of care, foresight, prudence and diligence reasonably demanded at any given time by the conditions and circumstances.'" *Krys v. Lufthansa German Airlines,* 119 F.3d 1515, 1527 (11th Cir.1997) (citation omitted). Even leaving aside the principal acts of misconduct specifically highlighted above, virtually all of which demonstrate negligent if not reckless conduct, American has expressly conceded that the pilots breached a duty of care by failing to verify that "R" was in fact the identifier for the Rozo NDB before executing this command in the FMC. *See* Tr. of August 19th Hrg., at 29; Tr. of August 25th Hrg., at 85–86, 88; PTS, at § V ¶ 80 ("[T]he flight crew deviated from safe operating practices they were trained to observe in Latin America in that they failed to cross check and verify whether 'R' was the correct waypoint input for the Rozo NDB"). American has also expressly conceded that, if the crew had taken steps to verify that "R" was the identifier for the Rozo NDB, the aircraft would not have veered substantially to the left and the accident would not have taken place (either because the crew would have discovered that the identifier for the Rozo NDB was R-o-z-o or, if we accept the Defendant's theory that the pilots never intended to deviate from the STAR, might have realized that the Rozo 1 STAR actually began at the Tulua VOR and typed in the identifier for Tulua). *See* Tr. of August 19th Hrg., at 31–34; Tr. of August 25th Hrg., at 74–75; PTS, at § V ¶ 69 ("If the flight crew of Flight 965 had properly verified and executed the approach to the airport . . . the accident would not have occurred"). And since that the

---

**27.** The Defendants' expert, Jeff Noe, acknowledged at deposition that Tafuri and Williams undoubtedly knew that the enroute radar at the Cali airport had been dysfunctional for some period of time (although he suggested that the pilots somehow "may not have recognized they were not in radar contact"). PSC Mot., exh. 21, at 153–54. Indeed, American Airlines pilots were advised that many Latin American airports

lack functioning radar systems, and that therefore Latin American ATC's must rely on the pilots of incoming flights for information about the location of the aircraft. To the extent that the pilots *did* know the radar was disabled, of course, the ATC's inability or unwillingness to inform Flight 965 of the danger of its position, and "correct" the pilots' errors, would have been all the more foreseeable.

cabin crew members unquestionably suffered fatal injuries as a result of the crash, there is no genuine issue of material fact as to the first three elements of negligence under Florida law.

■ What American does contest is the Plaintiffs' belief that the failure to verify "R" was not only an actual cause of the crash, but also one of the proximate causes of the accident. This objection is unpersuasive, for all of the reasons stated above. *See supra,* at 1146–50. The fact that the pilots' error may have been foreseeable to Jeppesen or Honeywell does not make American Airlines any less responsible for a plain breach of duty by its employees that occurred subsequent to any breach of duty by these entities. Nor does American's view that the measure of fault attributable to Jeppesen or Honeywell outweighs the measure of fault attributable to the pilots change the analysis. No reasonable juror could find that the pilots' decision to type "R" into the FMC was anything other than a substantial factor contributing to Flight 965's eventual collision with a mountain during its attempted approach to the Cali airport. Moreover, the collision was an entirely foreseeable consequence of the pilots' misprogramming of the computer as they began to descend into the mountainous terrain surrounding the airport. Florida courts, like their federal counterparts, recognize that disputes about causation may be resolved at the summary judgment stage when reasonable jurors could reach only one conclusion as to proximate cause. *See, e.g, McCain v. Florida Power Corp.,* 593 So.2d 500, 504 (Fla.1992) (reaffirming the maxim that judges may decide questions of proximate cause only "where the facts are unequivocal," in other words, "where the evidence supports no more than a single reasonable inference"). Indeed, Florida courts have done so in aircrash cases analogous to the one at bar. *Independent Air, Inc. v. Tosini,* 600 So.2d 3, 4 (Fla.3d Dist.Ct.App.) (affirming trial court's entry of summary judgment in case involving an aircraft that collided with a mountain after the pilot knowingly descended the plane below the safe minimum altitude, notwithstanding the carrier's claim that the ATC directed the pilot to make the descent and gave him an incorrect altimeter setting), *rev. dismissed,* 613 So.2d 5 (Fla.1992).

■ American also suggests that summary judgment may not be entered against it because there remains a dispute about the Defendant's worker's compensation immunity with respect to the crew members. The crew members have come forward with an affidavit from an expert who states unequivocally that since American "has not made payments of benefits pursuant to the Florida Workers' Compensation Act to the dependents of the crew members, [it] may not avail itself of the statutory immunity set forth in § 440.11." Aff. of Ramon Malca, Feb. 10, 1997, at ¶ 7. American has, to date, come forward with no evidence whatsoever contradicting this opinion or the factual premises on which it is based, and even in its memorandum never squarely disagrees with the Plaintiffs' position. Although American does state that it "reserves its right to address workers' compensation issues if and when they arise," Def. Resp., at 18, the law is clear that a party opposing a summary judgment motion may not rest on conclusory denials if the moving party has come forward with evidence suggesting the absence of a fact issue for trial.

■ American next maintains that the cabin crew Plaintiffs' motion cannot be granted because the motion does not contain a concise statement of undisputed material facts, as required by Rule 7.5 of the Local Rules for the Southern District of Florida. While the Plaintiffs' initial memorandum does not contain a distinct section clearly identifying the specific facts they believe to be undisputed, the memorandum does catalogue a series of admissions by American Airlines. P'tiff. Mem., at 12–19. More to the point, the crew members' motion expressly adopts the statement of "indisputable" facts submitted by the PSC in conjunction with its application for partial summary judgment. *Id.* 6 n. 1. While we do not diminish the importance of Local Rule 7.5, we find no meaningful prejudice to the Defendant from any non-compliance with this rule by the cabin crew Plaintiffs, especially given the relative narrowness of the dispute in these

cases and the abundance of undisputed facts recounted in the joint pre-trial stipulation. Accordingly, we are unwilling to deny the Plaintiffs' otherwise meritorious summary judgment motion solely on the basis of the Local Rule. *Cf. Johnson v. Mortham*, 915 F.Supp. 1529, 1548 (N.D.Fla.1995) (declining to deny summary judgment motion based on moving party's failure to supply a statement of undisputed material facts, notwithstanding a Local Rule which provided that this omission "constitutes grounds for denial of the motion," where the undisputed facts were apparent elsewhere in the record).

■ Finally, the Defendant suggests that Florida's apportionment statute precludes the entry of partial summary judgment against it, since a jury must be allowed to determine the relative fault of American Airlines when compared to the fault, if any, of Jeppesen, Honeywell and the Colombian ATC's. Section 768.81(3) of the Florida Statutes essentially provides that judgment may be entered against a tortfeasor whose acts proximately caused the plaintiff's injuries only in an amount that reflects the extent to which the defendant's acts, as opposed to the acts of others, contributed to the injuries. *See, e.g., Allied–Signal, Inc. v. Fox*, 623 So.2d 1180, 1182 (Fla.1993); *Fabre v. Marin*, 623 So.2d 1182, 1185–87 (Fla.1993). The cabin crew Plaintiffs do not dispute that, if American Airlines is found liable on a theory of negligence, an apportionment of fault is required before judgment may be entered in their favor. Nor do the Plaintiffs dispute that summary judgment cannot be entered on this issue at this time. But nothing in Florida law even arguably suggests that the need to apportion fault among various potential tortfeasors can or should dissuade a court from entering summary judgment as to

the liability of the one tortfeasor named as a defendant in the lawsuit. Accordingly, the prospect of subsequent proceedings relating to apportionment does not create an issue of fact concerning the discrete issue of whether the conduct of American Airlines' employees on the night of the crash breached the standard of care and proximately caused the death of the members of the cabin crew.[28]

■ We note, at this point, American's suggestion that the Florida apportionment statute applies not just to the cabin crew cases, but also to the Warsaw Convention claims of the passengers. This argument warrants little discussion. We are aware of no case in this or any other Circuit suggesting that a state apportionment statute affects the determination of an air carrier's liability for an injured plaintiff's compensatory damages under the Warsaw Convention. American's position apparently rests on the notion that, under the Supreme Court's decision in *Zicherman v. Korean Air Lines, Co., Ltd.*, 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996), the Convention is nothing more than a "pass-through" statute that requires application of the law of the forum state on the question of apportionment. Def. Resp., at 90 n. 157. To begin with, this argument is difficult to square with American's insistence, in opposition to the PSC's recent motion for leave to add punitive damages claims, that the Convention is not a mere "pass-through." The Court agreed with American's view in the course of denying the Plaintiffs' motion to amend:

> [T]he PSC contends that *Zicherman* stands for the proposition that the Warsaw Convention, and specifically Article 17, is nothing more than a "pass-through" statute for purposes of determining the recoverable damages. This may be an

---

**28.** In light of our conclusion that the passenger Plaintiffs, like the cabin crew Plaintiffs, are entitled to summary judgment on liability, the liability trial scheduled to begin on September 16, 1997 shall be cancelled. Accordingly, we need not devote further discussion to whether the issue of apportionment in the six crew cases should be tried at the same time as the passenger Plaintiffs' Warsaw Convention claims. Nevertheless, as indicated during the August 25th hearing, questions concerning the potential responsibility of Jeppesen, Honeywell and others are more

sensibly addressed in conjunction with the trial of American's pending third party contribution claims. While the effect of postponing resolution of the apportionment issue may be to delay the entry of judgment in the cabin crew cases, principles of economy and efficiency weigh in favor of resolving all matters concerning the conduct of third parties in a single proceeding, especially since Jeppesen and Honeywell—having been joined to this litigation at so late a juncture—are not now in a position to protect their interests adequately.

overstatement. The Supreme Court's comment on this point is contained the following passage:

> As we have discussed, the Convention itself contains no rule of law governing the present question; nor does it empower us to develop some common-law rule ... that will supersede the normal federal disposition. Congress may choose to enact special provisions applicable to Warsaw Convention cases, as some countries have done. Absent such legislation, however, Articles 17 and 24(2) provide nothing more than a pass-through, authorizing us to apply the law that would govern in the absence of the Warsaw Convention.

[516 U.S. at 229], 116 S.Ct. at 636. Thus, the Court's reference to the Convention as a "pass-though" was expressly limited to "the present question," *i.e.* loss of society damages. Moreover, the PSC's argument cannot readily be squared with the Supreme Court's 1991 decision in *Eastern Airlines v. Floyd*, 499 U.S. 530 [111 S.Ct. 1489, 113 L.Ed.2d 569] (1991), which reversed the Eleventh Circuit by holding that the express language of Article 17, as well as the negotiating history, forbids recovery for purely psychic injury. This holding was not disturbed by *Zicherman*, and supports the view that the Convention operates as a "pass-through" with respect to damages only where it does not embody a particular "rule of law" on the recoverability of the damages in question.

Order of August 25, 1997, at 9–10. The scheme of liability created by the Warsaw Convention contemplates that a carrier will be liable for all "damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger...." American has pinpointed no language from the text of the treaty or from the negotiating history which can be read to suggest that the amount of money a passenger may recover from a carrier for the "damage sustained" as a result of that carrier's misconduct must be reduced to reflect the carrier's proportionate percentage of fault. There are other flaws with the Defendant's position. American never articulates quite why it believes Florida law would apply

across the board on the issue of apportionment of fault, especially since some of the cases pending before this Court did not originate in a Florida forum. Moreover, it is far from clear (although we offer no opinion on this issue at this time) that under Florida law a defendant held responsible for behavior amounting to "willful misconduct" can seek apportionments with respect to another potentially responsible actor. The principal case cited by American, *Stellas v. Alamo Rent–A–Car*, 673 So.2d 940 (Fla.3d Dist.Ct. App.), *rev. granted*, 683 So.2d 485 (Fla.1996), simply concludes that a *negligent* defendant may seek an apportionment of fault with respect to a non-party intentional tortfeasor whose acts contributed to the plaintiff's injuries. Id. at 942–43. For purposes of comparison, Florida law indicates that an *intentional* tortfeasor may not seek to apportion its fault. Fla. Stat. 768.81(4) (stating that the apportionment provision "applies to negligence cases" and "does not apply to any action ... based upon an intentional tort").

## VIII.

For all of the foregoing reasons, we conclude that both the passenger Plaintiffs and the crew Plaintiffs are entitled to summary judgment on the issue of liability. The crew members' entitlement to summary judgment is clear, and the Defendants' objections give us little pause. The PSC's motion, however, raises more troubling questions, principally because the result that it seeks—a finding that the pilots of Flight 965 demonstrated willful misconduct as a matter of law—is unusual and carries tremendous consequences for the litigation. It would be easy enough for us to look at the complicated and lengthy record in this lawsuit, assume that a genuine dispute of material fact must exist as to all of the PSC's theories and compel the Plaintiffs to endure the time, expense and vagaries of trial. But in the end, even after a painstaking scrutiny of the record and having viewed the evidence in the light most favorable to the Defendant, we conclude that the undisputed facts, and the many points conceded by American, simply leave no room for a *reasonable* jury to find that the pilots' deliberate decision to continue to descend the

aircraft from an off course position at night, in an environment known for high terrain, and despite the unequivocal warning of their training that "[m]ost of the aircraft that have hit the mountains [in Latin America] did so because the crew apparently did not know where they were" was anything other than an act of willful misconduct -whether we examine the state of mind of the pilots or simply the myriad clues that told them just how far, and how dangerously, off course Flight 965 had traveled.

Accordingly, it is hereby

ORDERED AND ADJUDGED that the PSC's motion for partial summary judgment on liability, and the cabin crew members' separate motion for summary judgment on liability, are GRANTED. The liability trial scheduled for September 16, 1997 is CANCELLED, and the Defendants' motion for continuance, filed August 26, 1997, is DENIED AS MOOT.